No. 22,986.

THE MITCHELL GRAIN & SUPPLY COMPANY, *Appellee*, v. THE MARYLAND CASUALTY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. DEFAULTING EMPLOYEE—*Report of Accountant as to Shortage.* The evidence as a whole is held not to show that the report of an accountant as to a shortage of an employee was arrived at upon an improper basis.

2. INDEMNITY BOND—*Shortage of Employee—Interpretation of Word "Embezzlement" as Used in Bond.* In a bond insuring an employer against losses sustained by reason of conduct of an employee constituting embezzlement the word "embezzlement" is to be construed broadly in its general and popular sense, rather than in a narrow and technical spirit with specific reference to the local statute; and a loss occasioned by the employee's speculating on the market in the name of the employer, but without his knowledge or consent, is within the protection of the bond.

3. SAME—*Employer's Warranty that Books Shall Be Inspected Every Three Months.* Where a contract of insurance against losses through the embezzlement of an employee contains a warranty on the part of the employer that the books shall be inspected, audited and verified at ·least once in three months, this requirement is met by an examination conducted by the officers of the employing company, and does not involve the employment of an expert accountant for the purpose; nor does the fact that the examinations that were made failed to disclose .shortages that were afterwards found to have existed necessarily show any breach of the warranty.

4. SAME—*Requirement that Employee's Shortage Must Be Discovered Within Six Months After Discharge.* The requirement of a bond of indemnity against the results of embezzlement by an employee that losses to be covered by it must be discovered within six months after his discharge is met where within that period the fact of a shortage becomes known, although its exact amount is not ascertained until later.

Appeal from Rice district court; DANIEL A. BANTA, judge. Opinion filed February 12, 1921. Affirmed.

*C. M. Williams,* and *D. C. Martindell,* both of Hutchinson, for the appellant.

*Samuel Jones,* and *Ben Jones,* both of Lyons, for the appellee.

The opinion of the court was delivered by

MASON, J.: The Mitchell Grain & Supply Company, a corporation dealing in grain, live stock and coal, employed F. H. Biesemeyer as its manager, the Maryland Casualty Company executing a bond for him. He served in that capacity for about four years. His employer brought an action against the surety company alleging that he was short in his accounts. The plaintiff recovered judgment and the defendant appeals.

1. The trial was had without a jury. The court found a shortage evidenced by the difference between the cash shown by the books kept by the manager to have been received by him and that accounted for therein. In the finding the amount was stated to be $1,758.38. The evidence showed it to be $1,788.16, but the difference in the figures is not material to the present inquiry. The defendant argues that the finding is without. support. The argument, however, is based upon the assumption that the amount was arrived at by taking the

difference between the total cash received and the total amount of cash deposited in the bank. The accountant upon whose investigation and report the plaintiff relied made statements in his cross-examination which taken by themselves tended to support that theory. But his testimony as a whole made it reasonably clear that what he deducted from the cash receipts was not the bank deposits alone, but a sum which included all the cash shown by the books to have been paid out in any way. The situation in this regard is shown by this extract from the cross-examination:

"Q. You go to work to see how much money he has deposited in the bank on the theory that all the cash which he has received has been deposited in the bank? A. No, on the theory that it has been deposited in the bank less what he has paid out.

"Q. Now, you took the deposits in the bank and what he has paid and what does that show? A. $40,305.63.

"Q. And you deduct $40,305.63, being the amount that he has deposited in the bank as shown by his deposit slips and pass book, from $42,093.79, and you conclude that the difference is a shortage which he has appropriated. Is that your proposition? A. Yes, sir; that is my proposition.

"Q. Now, you say that his cash book shows items of cash that was not deposited? Did I understand you to say that? A. No, I don't believe I did.

"Q. Well, does it? A. His cash book shows items in this way that are not deposited; that he has received $1,788.16 more than he has deposited.

"Q. But how do you know that all the cash that he has received has been deposited in the bank? A. It has not been all deposited.

"Q. Suppose a man comes in with a small parcel of wheat or oats and he pays for it out of the drawer from cash received. That never goes into the bank? A. He has no record of paying it out.

"Q. Have you a record of what has been paid out? A. We have made a schedule showing the actual cash that has been paid, according to his cash book."

In the redirect examination the witness said:

"This record of investigation shows the cash that he paid out that never went into the bank. If a man came along and sold something for cash, and he paid him cash out of the drawer, he has made a record of that. We have the cash book pages and the amounts that he has taken credit for, and I have given him credit for that in the deduction amount."

2. The other item of shortage upon which the judgment was based is a loss of $1,600 made by the manager in a speculation on the pork market conducted in the name of the grain

company, the transaction, however, not being shown upon its books. The bond executed by the defendant undertook to reimburse the plaintiff "for such loss of money, securities and the personal property belonging to or in the possession of the employer . . . which the employer shall have sustained by reason of any act or acts constituting larceny or embezzlement, committed by the employee." The defendant contends that the act of the employee in investing the plaintiff's money in a losing venture on the market did not constitute embezzlement. This court has already held that a bond indemnifying an employer against loss due to the "fraud or dishonesty" of an employee "amounting to embezzlement" is to be construed as covering acts of the general character indicated, and that in an action thereon it is not necessary to a recovery to prove embezzlement with technical accuracy. (*Bank v. Colton,* 102 Kan. 365, 170 Pac. 993; *Milling Co. v. Surety Co.,* 104 Kan. 790, 180 Pac. 782.) It is true that in the bond now under consideration the words "fraud and dishonesty" do not appear and the phrase "constituting embezzlement" is used instead of "amounting to embezzlement," so that its language is not exactly the same as that passed upon in the cases cited. However, the substantial similarity of the question involved is shown by these quotations from the opinions:

"Without regard to the statutory definition of these offenses [larceny and embezzlement], the facts established by the evidence justified the conclusion of law that the cashier's conduct amounted to embezzlement within the meaning of that term as used in the bond. To hold otherwise would defeat the purpose for which the bond was given and the premiums accepted by the surety company. We think the term 'embezzlement' as used in the bond has a generic, and not a specific, meaning." (*Bank v. Colton,* 102 Kan. 365, 368.)

"In the bond the defendant undertook to reimburse the plaintiff for any pecuniary loss which it might sustain by reason of the fraud or dishonesty of the agent in connection with the duties and obligations of his position, and in withholding the property and money of the plaintiff, and the fraudulent appropriation of the same to his own use, he violated his duty and obligation to the plaintiff, which substantially amounted to embezzlement and constituted a manifest breach of the fidelity bond." (*Milling Co. v. Surety Co.,* 104 Kan. 790, 793.)

As used in this connection "constituting embezzlement" must be regarded as essentially the equivalent of "amounting to embezzlement." The bond is to be interpreted in the light

of its nature as a contract of insurance, in view of its purpose as such, and with a considerable degree of liberality in favor of the insured and against the insurer by reason of its having framed the contract. A risk fairly within its contemplation is not to be avoided by any nice distinction or artificial refinement in the use of words. The term "embezzlement" must be deemed to have been used in its general and popular sense rather than with specific reference to the precise definition of the local statute. One who unlawfully makes way with the property of his employer intrusted to his care may be an embezzler even although he derives no personal benefit from the transaction. (20 C. J. 427-9; 9 R. C. L. 1275-6.) The manager claimed that in the pork deal he acted with the advice of the vice president of the grain company, but the court obviously disbelieved his statement. He also asserted that he had previously made money for the company by hedging on wheat deals and that the purpose of the pork transaction was to hedge against loss through the government fixing the price of wheat. The trial court found specifically that the company had no knowledge of any such speculation in wheat; and selling pork for future delivery in the expectation that the government would likewise regulate its price can hardly be seriously considered as a justifiable hedge against a loss in wheat.

3. The application of the defendant for the making of the bond sued upon contained a warranty that the manager's books, accounts and securities would be inspected and audited and the outstanding accounts verified at least once in three months. The defendant urges that if the books had been audited in accordance with this agreement the plaintiff would necessarily have discovered at once that the manager had been speculating upon grain futures; that if it did not make such a discovery there must have been such a breach of the warranty as to constitute a defense to the action on the bond; and that if it did learn of the manager's misconduct in this regard its failure to inform the defendant (as the contract also required) must likewise interpose a bar to its recovery. It was shown, however, that a meeting of the directors was held each month at which a statement was submitted by the manager, and the trial court specifically found, upon what we re-

gard as sufficient evidence, that at least once in every three months the officers made an examination of his books, but that they were so kept that they were unable to ascertain the real condition of his accounts, and could not and did not discover any misappropriation until about the time of his discharge. These considerations sufficiently dispose of the contention referred to. The warranty in question cannot fairly be construed as requiring a periodical examination by an expert accountant, or by any one who from an inspection of the books could be certain of detecting any misappropriation of funds. (14 R. C. L. 1150; *Prosser Power Co. v. United States Fid., etc. Co.,* 73 Wash. 304.) In behalf of the defendant it is urged that the plaintiff must have known that the manager was speculating in wheat. The trial court, however, found to the contrary and the question was one of fact. Moreover, a distinction might be drawn between hedging with respect to wheat on hand and held for want of cars in which to ship it and a pure gambling transaction in pork.

4. The bond insured the plaintiff only against such losses as should be discovered "within six months after the expiration or cancellation of this bond, or any renewal thereof, or in case of the death, resignation, or removal of the employee prior to such expiration or cancellation, then within six months after such death, resignation or removal." The bond was given May 15, 1914, covering a period of one year, and was renewed several times, the last renewal expiring May 15, 1918. One of the plaintiff's witnesses testified that Biesemeyer was discharged in April, 1918. A final ground upon which a reversal is asked is that the employer's loss was not discovered within six months of that time. The basis of this contention is an allegation in the petition in these words: "That plaintiff did not discover said abstractions of its money and the wrongful taking thereof by said Biesemeyer and the full nature thereof until about the middle of December, 1918, when plaintiff caused its books and accounts kept by said Biesemeyer to be audited by one John A. Grant, an auditor employed by plaintiff, when plaintiff learned for the first time of the nature and amount of said claim and of the nature and amount of said sums so wrongfully appropriated and converted by said Biesemeyer." There was evidence that in May,

1918, the existence of a shortage was suspected and an expert accountant was employed to examine the books for that reason; that the pork transaction was discovered in this month and acknowledged by Biesemeyer in the following October, in which month the first report of the accountant was made; that the full report of the final result of the examination was made in the following December. The allegation quoted from the petition may reasonably be interpreted as meaning merely that the exact amount of the shortage was not finally determined until December. No point appears to have been made by the defendant in the district court with respect to this feature of the case. The answer contained an allegation that in May, 1918, the plaintiff informed Biesemeyer of all the shortages which were afterwards set out in the petition. The requirement that the loss occasioned to the employer should be discovered before the expiration of six months after the discharge of the employee is sufficiently met by the fact of the existence of the shortage becoming known within that time, although its exact amount may not have been determined until later.

The judgment is affirmed.