WORLD EXCHANGE BANK, Appellant, *v.* COMMERCIAL CASUALTY INSURANCE COMPANY, Respondent.

2 

(Argued October 21, 1930; decided November 18, 1930.)

Max E. Greenberg and Meyer Greenberg for appellant. Payment against the uncollected forged instruments was the establishment by plaintiff of credit to its customer on the faith of forged checks and plaintiff is entitled to recover for the resulting loss under the bond. (*International Union Bank* v. *National Surety Co.*, 245 N. Y. 368; *Silverstein* v. *Metropolitan Life Ins. Co.*, 254 N. Y. 81; *Underwood* v. *Globe Indemnity Co.*, 245 N. Y. 111; *Trade Bank* v. *U. S. F. & G. Co.*, 229 N. Y. Supp. 93; 249 N. Y. 546.) There was loss to plaintiff through statutory larceny and plaintiff is entitled to recover, therefore, under the bond. (Morse on Banks & Banking [6th ed.], 831; *Trade Bank of New York* v. *U. S. F. & G. Co.*, 249 N. Y. 546.) Knowing and willful payment of checks against uncollected funds by plaintiff's paying teller, made in direct violation of instructions, is a breach of trust and dishonesty within the meaning of the bond, and plaintiff is entitled to recover resulting loss. (*Eland State Bank* v. *Massachusetts Bonding & Ins. Co.*, 165 Wis. 493; *First Nat. Bank* v. *National Surety Co.*, 243 N. Y. 34; *First Nat. Bank* v. *U. S. F. &*

*G. Co.*, 137 N. W. Rep. 742; *Citizens State Bank of St. Paul v. New Amsterdam Casualty Co.*, 224 N. W. Rep. 451; *Dudley v. City of Flemingsburg*, 115 Ky. 5; *United States v. Breese*, 131 Fed. Rep. 915.)

*Colley E. Williams* and *Allan C. Rowe* for respondent. The mere payment of checks drawn against uncollected funds does not constitute dishonesty within the meaning of the bond. (*First Nat. Bank v. National Surety Co.*, 243 N. Y. 34; *Parker v. Sprague*, 114 N. W. Rep. 361.) A mere violation of instructions by an employee resulting in a loss to the plaintiff bank would not constitute fraud or dishonesty and would not subject the defendant to liability upon the bond. (*American Surety Co. v. Gracey*, 252 S. W. Rep. 263.) The defendant herein is not liable for plaintiff's loss resulting from statutory larcenies effected by means of forgeries committed by a depositor. (*Trade Bank of New York v. U. S. F. & G. Co.*, 249 N. Y. 546.) The provision of the bond as to losses through payment of forged checks or the establishment of any credit to a customer on the faith of such checks does not apply to drafts or acceptances. (*Harris v. Clark*, 3 N. Y. 93; Neg. Inst. Law, § 210; *United States Rail Co. v. Wiener*, 169 App. Div. 561; *Amsinck v. Rogers*, 103 App. Div. 428; 189 N. Y. 252; *McCluskey v. Cromwell*, 11 N. Y. 593.)

CARDOZO, Ch. J. The plaintiff, a bank in the city of New York, received from the defendant a bond or policy of insurance indemnifying it against certain described losses suffered in its business.

Martin Katz, trading as Tunney Rooters, opened a depositor's account with the plaintiff on September 14, 1926. Between that time and September 23, he deposited a number of checks and drafts, some genuine, some forged. The checks, when forged, were drawn on banks in the far west. The drafts were drawn on the Metropolitan Mortgage and Securities Company, which was merely a trade name for Katz himself.

There was a rule of the bank that payments were not to be made to a depositor against uncollected items of deposit without the consent of the president, or, at times, another officer. During the days when the fictitious items were in course of collection, Katz drew his checks on the account, handed them to the paying teller, and received the cash over the counter. The teller, Castellano, paid them believing them to be good, but mindful of the fact that they were drawn against uncollected items of deposit. On the presentation of the first check, one for $600, he received the approval of the president before paying out the money. When the other checks were offered, he paid them without inquiry. On September 23, 1926, about a week thereafter, the fictitious items of deposit were returned uncollected. A loss had then been suffered in the sum of $22,824.50, for which the bank has had judgment upon the contract of indemnity. The Appellate Division, reversing this judgment, has ordered a new trial. The case is now here upon an appeal by the plaintiff with a stipulation for judgment absolute. The reversal being on the facts as well as on the law, the plaintiff, to prevail, must satisfy the court that the loss as a matter of law is within the coverage of the bond (*Goodman* v. *Marx*, 234 N. Y. 172). If there is any question of fact from which opposing inferences can be drawn, the Appellate Division was free, in the exercise of its discretion, to order a new trial.

The plaintiff points to three subdivisions of the policy, designated A, B and D, as covering the loss. They will be considered in succession.

Subdivision A gives indemnity to the bank for "any loss through any dishonest or criminal act of any of the insured's officers, clerks or other employees * * * wherever committed and whether committed directly or by collusion with others." The plaintiff says that Castellano was guilty, as matter of law, of a dishonest or criminal act when, mindful of the state of the account, he

permitted a depositor to draw against uncollected items of deposit without the president's approval.

We think the quality of the act is not so obvious and determinate as to exclude opposing inferences (*First Nat. Bank* v. *National Surety Co.*, 243 N. Y. 34). Criminal the act was not, unless done with criminal intent (*People* v. *Baker*, 96 N. Y. 340; *People* v. *Flack*, 125 N. Y. 324; *People* v. *Wiman*, 148 N. Y. 29). The presence of that intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be " dishonest," for dishonesty within such a contract may be something short of criminality (*City · Trust, S. D. & S. Co.* v. *Lee*, 204 Ill. 69; *Mitchell Grain & Supply Co.* v. *Maryland Casualty Co.*, 108 Kan. 379, 383; *Ætna C. & S. Co.* v. *Commercial State Bank*, 13 Fed. Rep. [2d] 474; *United States F. & G. Co.* v. *Egg Shippers' S. & F. Co.*, 148 Fed. Rep. 353; *Genesee Wesleyan Seminary* v. *United States F. & G. Co.*, 247 N. Y. 52, 57). The appeal is to the *mores* rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. " Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract " (*Bird* v. *St. Paul F. & M. Ins. Co.*, 224 N. Y. 47, 51; *Silverstein* v. *Metropolitan Life Ins. Co.*, 254 N. Y. 81, 84).

If this standard is to govern, we think the quality of the teller's act is for the triers of the facts. He was not acting *lucri causa,* to gain some benefit for himself. He was not acting with the thought of *giving* anything to any one, or so the triers of the facts might say. The money was due if the uncollected checks were good. He believed them to be good, for, with or without sufficient reason, he believed them to be certified. He ought,

even then, to have consulted his superior instead of venturing to act alone. None the less, his only object was the furtherance of the business without useless fuss and pother. The act was a wrongful one, very likely a technical conversion, certainly a departure from instructions, but in the common speech of men there would be reluctance to describe it as flagitious or dishonest. A different question might be here if payments against uncollected items had been forbidden always and to every one, had been excluded altogether from the business of the bank. Here they were not excluded altogether, but were permitted if made with a superior's approval. The situation is much the same as if the teller had been required to verify the state of the account by reference to the ledger, and had chosen to take a chance and trust to recollection. The act, even if prohibited, was not so radical a departure from the general business of the bank or the functions of the actor as to exact an imputation of dishonesty when there was innocence of motive.

Subdivision B gives indemnity for any loss " through robbery, burglary, larceny (whether common law or statutory), theft, hold-up, misplacement or destruction * * * while the property is actually within the offices of the insured." This clause might apply to the loss suffered by the plaintiff if it were not for a subsequent exception. By subdivision 2 (a), the " bond does not cover any loss effected by means of forgery, except when covered by insuring clauses A and D." The loss in question was one effected by means of forgery (*Trade Bank of N. Y.* v. *United States F. & G. Co.*, 249 N. Y. 546), and unless covered by A or D must be held to be excluded.

Subdivision D gives indemnity for " any loss through the payment * * * of forged checks * * * or the establishment of any credit to any customer on the faith of such checks." Part of this loss was caused by the establishment of a credit on the faith of forged checks,

but part only. Most of the loss came through a credit not for checks, but for drafts or bills of exchange. The rule at common law was inveterate and inflexible that a check must always be drawn on a bank or banker (2 Daniel Neg. Inst. §§ 1566, 1568; *Bowen* v. *Newell*, 8 N. Y. 190, 195; *Merchants Bank* v. *State Bank*, 10 Wall. [U. S.] 604, 647; *Espy* v. *Bank of Cincinnati*, 18 Wall. [U. S.] 604, 620). The statute, indeed, is even narrower for it limits a check to a bill drawn on " a bank " (Neg. Inst. Law; Cons. Laws, ch. 38, § 321). We assume for present purposes that in the construction of a business document such as the policy in suit, the definition may be widened, in accordance with common-law analogies, to include drafts upon a " banker " (cf. Banking Law; Cons. Laws, ch. 2, § 2). Indeed the very title of the policy, " banker's blanket bond," reinforces this assumption as to the range of its protection. The Metropolitan Mortgage and Securities Company, however, was neither a bank nor a banker. It was merely a trade name for Katz or for Wise, his alias. The plaintiff was not told that it was a bank, and, for anything that we can say with certainty, did not believe it to be one.

We do not mean that the actual nature of the business is decisive if in conflict with appearances. A policy of insurance covering loss from credits on the faith of forged checks may not unreasonably include documents purporting to be checks and so dealt with by the insured, though in truth they are merely drafts on non-existent corporations or worthless men of straw. The difficulty is that there is nothing in the evidence to call for the conclusion, at least as one of law, that the plaintiff received the drafts in the belief that they were checks, or that the belief, if it existed, was reasonable in the light of facts disclosed. On the contrary, the evidence is at least consistent with the conclusion that the plaintiff in crediting its customers did not attempt to discriminate between checks and other drafts, but dealt with paper

of each class on a footing of equality. True, the bills were marked " accepted," but acceptance is not confined to checks. The common formula for certification employs another word. Certification is equivalent to acceptance (Neg. Inst. Law, § 323), but it is also something more. Unlike a mere acceptance it is more than a promise by an acceptor to assume the payment of the draft; it is a warranty that funds sufficient for that purpose are presently on deposit, and have been set aside for that use (*Merchants' Bank* v. *State Bank, supra; Goshen Nat. Bank* v. *Bingham*, 118 N. Y. 349).

At most the question is one of fact whether the drafts were credited with the understanding, reasonably induced, that they were drawn on a bank or banker, and hence to be credited as checks. This is so for many reasons. The plaintiff might reasonably be expected to know the banks and bankers doing business in its own city. On the face of the documents the drawee was described as located in New York. There was thus opportunity and invitation to investigate its origin. The name does not contain within itself a representation, express or implied, that the company assuming it is an incorporated bank, still less a private banker. The slightest inquiry would have shown that it was nothing of the kind. The trade certificate on file sets forth the purposes of the business. They are not the activities characteristic of the business of banking (*Meserole Securities Co.* v. *Cosman*, 253 N. Y. 130). Nor was inquiry omitted altogether. An officer of the plaintiff bank called upon Katz at the opening of the account to investigate his standing. He was found occupying a desk with the grandiose title of his company inscribed upon the office door. If there were any visible tokens of a banking business, they are not mentioned in the record. True it is that the drafts were made out on engraved or printed blanks, similar in their make-up to the common form of checks, but this is not decisive of their character; though it is a circumstance which with

others may not be lacking in significance. To what extent it had a tendency to mislead the bookkeepers and tellers in the service of the plaintiff, the triers of the facts should say. There is at least an intimation in the record that it would not have misled them at all if they had used reasonable care. The intimation is that the Metropolitan Mortgage and Securities Company was known not to be a bank, but that a teller, glancing hastily at the paper, confused the name of the drawee with that of the Metropolitan Trust Company, and entered it accordingly.

We conclude that clause D is limited to genuine checks or to documents which in good faith and upon reasonable grounds are believed to be checks and are dealt with on that basis. Unless the documents are of that nature, the insured in crediting them takes the risk of forgery. Certainly the bond would not cover the forgery of a promissory note, or a coupon, or a bank note circulating as money, yet these too might be credited with ensuing damage. The word that is used in the policy has now, and for many years has had, a proper legal meaning. Nothing in the surrounding circumstances or elsewhere points to the conclusion that this meaning was discarded altogether in the thought of the contracting parties. On the contrary, a bank or banker, having regard to banking practice, would be unlikely to describe a bill of exchange as a check, unless drawn on a bank or banker. Certainly it would be unusual to credit such a bill as cash in anticipation of collection. The proper legal meaning is not different from the one commonly accepted in commerce and finance.

The order should be affirmed and judgment absolute ordered against the appellant on the stipulation, with costs in all courts.

POUND, CRANE, LEHMAN, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Ordered accordingly.