# Richmond

## HARTFORD ACCIDENT AND INDEMNITY COMPANY v. LOUIS SINGER AND MURIEL SINGER, PARTNERS TRADING AS SINGER'S JEWELERS.

October 14, 1946.

Record No. 3133.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Preston P. Taylor,* for the plaintiff in error.

*Tom E. Gilman* and *Halpern & Halpern,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

On July 31, 1944, the Hartford Accident and Indemnity Company issued to Louis Singer and Muriel Singer, partners trading as Singer's Jewelers, a "Blanket Position Bond," or policy, which insured the Singers against loss by reason of the "larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wilful misapplication, or other fraudulent or dishonest act or acts committed by any one or more" of their employees.

The Singers were engaged in the installment jewelry business, with stores at Portsmouth and Alexandria, Virginia. At the time of the occurrences with which we are concerned the Portsmouth store was in charge of James O. Peterson as manager, and included among its installment salesmen one John O. Barwick, Jr.

On January 5, 1945, and within the period covered by the bond, Barwick absconded, taking with him various articles of jewelry with which he had been entrusted, and certain cash collections due his employers. Barwick has not been apprehended and by reason of his defalcations his employers have sustained an agreed loss of $1,734.61. To recover this amount the present suit was instituted.

The bond contained this provision: " * * * this bond shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or, if the Insured be a copartnership, by any partner thereof, or, if the Insured be a corporation, by any officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; * * * ."

The insurance company defended on the ground that shortly before Barwick absconded with the property and funds of his employers, the latter had discovered that he was delinquent in his accounts with them, and that the discovery of this fact had, under the above provision of the bond, then and there terminated its liability for the defalcation of this employee which is the subject of this suit.

The trial below resulted in a verdict and judgment in favor of the insured for the full amount claimed, and the matter is before us on a writ of error granted the insurance

company. In substance, the same defense advanced below is reasserted here.

It appears from the evidence that Barwick, as were the other installment salesmen, was given certain items of jewelry which he was to sell to customers solicited by him. The amounts paid by the various customers were entered on receipt books retained by the customers, and on records kept by the salesmen. It was the duty of Barwick to account weekly to his employers, or to the store manager, Peterson, for the collections made by him and for the unsold articles of jewelry. Until these weekly settlements were due Barwick was allowed to keep in his possession both the unsold articles which had been entrusted to him and the cash collections made by him.

By way of compensation for their services the salesmen, including Barwick, were paid commissions on their sales or collections. Pending the weekly settlements with their employers, Barwick and the other salesmen were permitted to spend for their personal use such portion of their collections as they needed. If at the time of the weekly settlement it developed that a salesman's withdrawals were less than his earned commissions, the employers paid him the difference. If, on the other hand, a salesman's withdrawals exceeded his earned commissions the excess was charged against his earned commissions for the succeeding week.

From time to time, each salesman's records were checked against the customers' records to ascertain whether the salesman had correctly reported the sales and collections made by him. Barwick had been given a clean bill of health on one or two such checkups during the fall preceding his defalcation.

In the latter part of December, 1944, Barwick failed to show up for two days and this aroused the suspicion of Peterson, the store manager, who checked Barwick's accounts as to the accuracy of sales reported and commissions earned and withdrawn. This checkup was completed on January 3, 1945, and while it showed that Barwick had correctly reported all sales made to and collections from customers,

it further disclosed that he had overdrawn his commissions by the sum' of $125. It also developed that Barwick's absence, which caused the checkup, had been due to his drinking to excess during the Christmas holidays.

However, Peterson did not regard these as matters of serious moment, or as indicating any dishonesty on Barwick's part. As a matter of fact, Peterson said, the salesmen frequently overdrew the amount of their earned commissions and were permitted to repay these overdrafts out of their subsequently earned commissions. Accordingly, the ·manager made a loan of $100 to Barwick with which to liquidate the major portion of his overdraft, accepted his promise to pay back the balance of $25 in weekly installments, and' continued his employment. He knew Barwick to be a good salesman, with a good earning capacity, and anticipated that the indebtedness would be liquidated within a reasonable period. Two days later, or on January 5, Barwick disappeared.

In the meantime neither of the partners knew anything of Barwick's overdraft or the arrangement which the local manager had made with him. Louis Singer, the active partner, was at that time in Alexandria, and Mrs. Muriel Singer, the inactive partner, took no part in the conduct or management of the business.

The insurance company insists that it was for the jury to say, under proper instructions from the court, whether· the overdraft by Barwick in his commission account was such a "fraudulent or dishonest act" on his part as to bring into operation the cancellation clause in the contract, and that the lower court erred in not submitting this issue to the jury.

Moreover, the insurance company says, while neither partner had *actual* knowledge of Barwick's conduct, both had *constructive* knowledge thereof through the knowledge of their manager, Peterson, which was imputed to them. Such imputed or constructive knowledge, the insurance company argues, was sufficient to bring into operation the cancellation or termination clause relied upon.

In our opinion neither of these contentions is sound.

It is true that whether a particular act is fraudulent or dishonest usually depends upon the intent with which it is done, and consequently the courts hold, in construing this or like provisions in fidelity bonds, that ordinarily it is for a jury to say, under the circumstances of the particular case, whether the intent to defraud was or was not present. *Bank of Erie Trust Co.* v. *Employers' Liability Assur. Corp.*, 322 Pa. 132, 185 A. 224, 104 A. L. R. 1170.

But in the case before us the facts were not in dispute. There is no evidence that in overdrawing his commission account Barwick had any intent to embezzle the funds of his employers or otherwise to defraud them. A fraudulent or dishonest act is one which involves bad faith, a breach of honesty, a want of integrity, or moral turpitude. None of these elements appears here.

The evidence is uncontradicted that Barwick and the other salesmen were permitted to deduct their commissions from their cash collections, and that sometimes the total withdrawals for a particular week exceeded the earned commissions for that period. When this situation occurred the employers merely treated it as a civil matter and deducted the excess from the salesman's earnings for the coming week. This is exactly what happened in Barwick's case when the checkup showed that his withdrawals for a particular week amounted to $125 more than his earned commissions for that period. The manager treated this not as a defalcation or embezzlement or dishonest act, but merely as a civil liability of Barwick to his employers, and allowed him to arrange for its liquidation in the usual manner.

Whether it was bad practice for the insured to have permitted their salesmen to overdraw their commission accounts, or even to pay themselves out of their cash collections, is not before us. But the fact that Barwick used his employers' funds in a manner which they permitted, acquits him of any fraudulent or dishonest intent with respect to this overdraft. There is, of course, no moral turpitude or breach of honesty or want of integrity in an

employee's using the employer's property in a manner which the latter permits and allows.

We agree with the trial court that there was no evidence upon which the jury could have found that Barwick was guilty of such a "fraudulent or dishonest act" as to bring into operation the cancellation clause in the contract sued on.

Nor can we agree with the contention of the insurance company that the discovery by Peterson, the manager, of Barwick's overdraft was imputable to the partners under the terms of the bond sued on. The language is: " * * * this bond shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or, *if the Insured be a copartnership, by any partner thereof,* * * * of any fraudulent or dishonest act on the part of such Employee; * * * ." (Italics supplied.)

The language was written by the insurance company and under elementary principles must be construed most strongly against it.

Clearly it means, we think, that in order for liability under the bond to have been terminated as to any employee of a partnership, knowledge of the delinquency of the employee must have been brought to a partner himself and not merely to another employee of the firm. The discovery must have been made "by any partner thereof." There is no suggestion that discovery by or knowledge of an employee, of whatever rank, was sufficient to terminate the risk.

Then, too, practical considerations make it quite apparent that our interpretation of the provision was intended by the parties. Peterson himself was covered by the bond. Suppose his transactions and not those of a subordinate employee had been involved. Had Peterson defaulted, under the insurance company's theory, his employer-principals would immediately have had constructive knowledge thereof, and this would have terminated the liability under the bond and would have deprived the employers of the right

to recover for any subsequent defalcation by him. Such a result would, of course, have defeated one of the purposes of the contract.

Since the uncontradicted evidence is that neither partner knew anything whatsoever of Barwick's overdraft in his commission account, the cancellation clause relied on did not become operative, even if it be assumed that Barwick's act was fraudulent or dishonest within the meaning of the provision.

In our opinion the judgment is plainly right and accordingly it is

*Affirmed.*