Joe S. **WILSON**, Jr., Appellant,

v.

**NEUHOFF BROS. PACKERS** et al.,
Appellees.

No. 17304.

Court of Civil Appeals of Texas.

Dallas.

May 23, 1969.

Rehearing Denied June 20, 1969.

Jack Pew, Jr., of Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellant.

Erich F. Klein, Jr., of Lyne, Klein & French, Dallas, for appellees.

BATEMAN, Justice.

The appellant Joe S. Wilson, Jr. sued his former employer, Neuhoff Bros. Packers, Neuhoff Bros. Packers Management Corporation, and Republic National Bank of Dallas as trustee of a certain profit sharing plan for salaried employees of Neuhoff Bros. Packers, to recover certain funds which had accrued to his account under said plan. Liability was denied on the ground that Wilson's employment had been terminated by reason of dishonest conduct, resulting in forfeiture of his account under the terms of the plan. The jury found: (1) that Wilson was not guilty of dishonest conduct as charged, and (2) that the decision of the committee to forfeit Wilson's account was not made in good faith. On motion, the court disregarded these findings and rendered a take-nothing judgment notwithstanding the verdict. Wilson appeals asserting that there was ample evidence to support the jury findings, and that he was and is entitled to judgment thereon.

The facts are undisputed. Under the provisions of the indenture creating the plan, only the employer made contributions to the trust fund, and the employee-participants in the plan were given certain vested rights in the fund, distributable upon retirement or death, and providing for the distribution of only a portion of the account accredited to each employee upon the termination of his employment, the amount depending upon the number of his years of

service with the company. In this connection, the indenture also provided:

"If the participant's employment has been terminated by reason of dishonest or fraudulent conduct, he shall forfeit the entire amount of his account."

The committee appointed to administer the plan is given certain powers by the indenture, including the power:

"(b) To construe all terms, provisions, conditions and limitations of the plan, and its construction thereof made in good faith shall be final and conclusive on all parties at interest."

When Wilson was discharged, his account had been credited with $27,093.64 and, having completed twelve full years of service at that time, he had a vested interest therein of 60 per cent, or $16,256.18, to which he was clearly entitled unless the forfeiture was valid.

Wilson was employed by Neuhoff Bros. Packers as a livestock buyer. For several years prior to his discharge his employment required him to attend public auction sales of livestock. He was reimbursed for expenses incurred on his out of town trips, and was paid a regular salary. After he had attended the auction sales at the Leggott Livestock Auction in Waco, Texas for about three years, he learned that other buyers were being given "expense money" by Leggott. He let it be known that he would not be averse to receiving such gifts, and several weeks later he began receiving approximately $25 per week from Leggott's company. He received these payments over a period of about two years.

In January 1966, the United States Department of Agriculture made an investigation of the Leggott Auction and discovered the gifts to Wilson. The Department entered a cease and desist order against Leggott, but took no disciplinary action against Wilson. The representative of the Department of Agriculture testified that he considered it a violation of the Packers and Stockyards Act* for a man to accept or to give such payments. The payments were made by Leggott to Wilson by checks, which Wilson deposited in his bank account and reported on his income tax returns. He told other Neuhoff buyers of getting these payments but did not report it to those in charge of Neuhoff.

Wilson had never been instructed not to accept such gifts, but when his employer learned of the matter Wilson was fired solely because of his having accepted them. His demand of the amount due him out of the account credited to him under the plan was denied by Neuhoff on advice of counsel on the ground that his employment had been terminated because of his "dishonest" conduct.

Appellees' theory, as set forth in their pleadings, is that Leggott's purpose in making these payments to buyers of meat packing companies was to induce Wilson and other buyers to attend the Waco auction rather than some other auction on the hypothesis that the bidding is more lively and the prices higher when a large number of buyers attend than when fewer buyers are present, and that Wilson was dishonest and disloyal to his employer in attending the Waco auction (and in being paid to do so) and thus paying higher prices for livestock than he would have paid had he attended a sale not so well attended. On the trial appellees endeavored to show that buyers so compensated by Leggott would feel obligated to bid more for livestock than they would otherwise, thus increasing Neuhoff's outlay as well as Leggott's commissions. Leggott testified that he did not think that a buyer to whom he had been paying $25 a week might feel obligated to "help him out on the bidding," but that it might happen and, when asked his opinion as to whether there was a good possibility that such a buyer's loyalty might be divided between his employer and Leggott, said: "I don't know, it's a good possibility." He said that at the time he thought it was all right to make the payments because Wilson

* 7 U.S.C.A. Ch. 9.

was a regular buyer and a good buyer with a good company.

Both Leggott and Wilson testified that the payments in question did not cause him to "overbid" and did not influence his bidding one way or the other. There was no evidence to the contrary. Within a few days after his discharge Wilson was employed by another meat packing company as a buyer, and his registration to work as such buyer for the new employer was approved by the Department of Agriculture. Leggott testified that he did not think there was any difference in Wilson's bidding since he began working for the new employer and his buying practices while he was working for Neuhoff.

■ Certain well settled principles of law serve to guide us in our analysis of this situation. In the first place, although the employees contributed no money to the trust fund in question they acquired certain vested interests therein. The vested right of each such employee was not in any sense a donation from the employer, but was additional compensation for faithful and continuous service over a long period of time. Herring v. Blakeley, 385 S.W.2d 843, 846 (Tex.1965); Lee v. Lee, 112 Tex. 392, 247 S.W. 828 (1923); and Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 231 A.2d 800, 803 (1967), where a similar plan is spoken of, not as a mere gratuity, but a "hard-headed business device to attract and to hold employees."

■■ In the second place, a forfeiture is involved and forfeitures are not favored in law or in equity. It is a harsh remedy and punitive in operation. The courts will not sanction or declare a forfeiture under a contract unless compelled to do so by language which will admit of no other construction; and if the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, such interpretation will be adopted. 25 Tex.Jur.2d, Forfeitures, § 3, p. 502; Dickenson v. Board of Trustees, 204 S.W.2d 418, 423 (Tex.Civ.App., Fort Worth 1947, writ ref'd).

■ In the third place, in determining whether a judgment *non obstante veredicto* is warranted the reviewing court must consider the evidence adduced in the light most favorable to the appellant, disregarding conflicts in the testimony and indulging in the appellant's favor every reasonable inference and intendment deducible from the evidence. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952); Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547, 550 (1962); Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359, 363 (1957). When different inferences may reasonably be drawn from the evidence, as well as when the facts are controverted, an issue of fact is raised. James v. Missouri-Kansas-Texas R. Co. of Texas, 182 S.W.2d 921 (Tex.Civ.App., Waco 1944, writ ref'd).

■ "Honesty" and "dishonesty" are not terms of art. They are relative terms, depending upon the standards applied. Moral standards change from time to time, and vary in different localities. See the opinion of Judge Learned Hand in United States v. Kennerley, 209 F. 119, 121 (1913), wherein he speaks of "the precise morals of an age or place"; also Jacobellis v. State of Ohio, 378 U.S. 184, 194, 84 S. Ct. 1676, 1681, 12 L.Ed.2d 793 (1964). Relationships which were considered entirely appropriate in Plato's time are now considered shameful and immoral, and conduct now accepted as entirely within the bounds of propriety was condemned as indecent and immoral a century ago.

In World Exchange Bank v. Commercial Casualty Ins. Co., 255 N.Y. 1, 173 N.E. 902 (1930), the question was whether the conduct of a certain bank employee was "dishonest" within the terms of an insurance policy indemnifying the bank against loss. The opinion was by the renowned Cardozo, then Chief Justice of the Court of Appeals of New York, and later a justice of the United States Supreme Court. He said, in part:

"We think the quality of the act is not so obvious and determinate as to exclude

opposing inferences. [citing cases] Criminal the act was not, unless done with criminal intent. [citing cases] The presence of that intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be 'dishonest,' for dishonesty within such a contract may be something short of criminality. [citing cases] The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.' [citing cases] If this standard is to govern, we think the quality of the teller's act is for the triers of the facts."

That language was quoted with approval by Judge Sanborn, speaking for the Circuit Court of Appeals, Eighth Circuit, in Fidelity & Deposit Co. of Maryland v. Bates, 76 F.2d 160, 167 (1935), which was a case involving alleged dishonest acts of a bank employee named Sloan. Judge Sanborn also said in that opinion:

"Like the question of negligence, the question of dishonesty must be left to the triers of fact if there is a conflict in the evidence, or even if there is no conflict, provided fair-minded men might honestly reach different conclusions. It seems clear to us that, under the evidence, the question as to whether the losses occasioned by the acts of Sloan were due to his dishonesty was a question for the jury. His acts in allowing overdrafts and in the kiting of checks must have been attributable to at least one of three things: Dishonesty, negligence, or utter incompetence. The jury evidently reached the conclusion that he was not merely negligent nor merely incompetent. They saw the witnesses, including Sloan, and heard them testify. We would have no disposition to disturb their findings, even if we had the power to do so."

Similar holdings by the United States Court of Appeals for the Seventh Circuit are found in London & Lancashire Indemnity Co. v. Peoples National Bank & Trust Co., 59 F.2d 149, 152 (1932), and Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, 202 F.2d 794, 798 (1953). In the latter case this language was used:

"Under the circumstances of this case we think that the issue of whether Smith's acts constituted dishonesty *within the meaning of the term in the bond* was a fact question for the jury to decide." (Italics ours.)

See also Home Indemnity Co. v. Reynolds & Co., 38 Ill.App.2d 358, 187 N.E.2d 274, 282 (1962), and Great American Ins. Co. v. Langdeau, 379 S.W.2d 62 (Tex.1964).

■ We do not hold that dishonesty of a servant or employee may never appear as a matter of law, for of course it can. National Surety Co. v. McCutcheon, 270 S.W. 1062 (Tex.Civ.App., Fort Worth 1925, writ dism'd w. o. j.). Neither do we wish to be understood as placing our seal of approval on Wilson's conduct in this case, for we do not. We understand and sympathize with Neuhoff's unwillingness to continue in its employ buyers who accept substantial gratuities from auction barns with which it does business. At the same time, we think most reasonable minds would agree that the summary forfeiture of Wilson's right to more than sixteen thousand dollars constituted harsh and unusual punishment, especially in the absence of any evidence that Neuhoff suffered, or was likely to suffer, any financial loss whatever because of Wilson's allegedly dishonest conduct. These were some of the circumstances which the jury had a right to consider in passing upon the fact issue as to whether the conduct was dishonest within the meaning of the language used in the inden-

ture. In our opinion, this fact issue was raised by the evidence, and the trial court properly submitted it to the jury, and appellees are bound by the finding thereon.

■ Appellees argue that Wilson's dishonesty appears as a matter of law because he received secret profits from one whose interests were adverse to those of his employer and owes a legal duty to account to his employer for such profits, and that his failure to do so, even in the absence of a demand therefor, was dishonest conduct. We need not pass on the question of whether the sums paid to Wilson by Leggott were actually owned by Neuhoff, for that contention and theory were injected into this case for the first time by appellees' brief. Neuhoff did not claim any right to these funds in its pleadings or in any other manner at the trial. In fact, its president specifically disclaimed any such contention in his testimony, adding that he considered Wilson a good buyer and that Neuhoff Bros. did not sustain any financial loss that he knew of by Wilson's acceptance of the payments from Leggott. The record shows quite clearly that the only dishonesty claimed was the acceptance by Wilson of the payments, not his failure to pay them over to Neuhoff. "Parties are restricted on appeal to the theory on which the case was tried in the court below." 3 Tex.Jur.2d, Appeal and Error—Civil, § 371, p. 628; State of Cal. Dept. of Mental Hyg. v. Bank of S. W. Nat. Ass'n, 163 Tex. 314, 354 S.W.2d 576, 581 (1962).

■ Special Issue No. 2, inquiring as to whether the decision to forfeit Wilson's account "was not made in good faith," relates to the hereinabove quoted portion of the plan which accorded to the committee administering the plan the exclusive power to construe all terms, provisions, conditions and limitations of the plan, and further providing that the committee's construction "made in good faith" shall be final and conclusive. Apparently no action had been taken to forfeit Wilson's account until he made demand for the amount due him, at which time the matter was referred to

Neuhoff's attorneys. Wilson was never given any hearing or other opportunity to present his side of the controversy; he was merely notified that, because of the attorneys' opinion that his conduct "required" the forfeiture of his account, his request would be denied. Taking this and the other circumstances into consideration, including the wide discrepancy between the total amount of the payments from Leggott to Wilson (not more than $2,600) and the $16,256.18 he was entitled to under the plan, we are of the opinion that a fact issue was raised as to the committee's good faith, that the issue was properly submitted to the jury, that the evidence was sufficient to support the verdict, and that appellees are bound by the verdict. But in any event the answer to Special Issue No. 1 makes Special Issue No. 2 immaterial, and even if we were to hold that the evidence did not raise an issue as to the committee's good faith, our decision to reverse would be unaffected thereby. Both of appellant's points of error are sustained.

■ By two counterpoints, appellees say in the alternative, that should it be determined that issues of fact were raised by the evidence with respect to whether Wilson was guilty of dishonest conduct or as to the committee's good faith, the findings were so contrary to the great weight and preponderance of evidence as to be clearly wrong and the judgment should, therefore, be reversed and remanded, rather than rendered. We have carefully examined the entire record and conclude that the jury findings are not against the weight and preponderance of the evidence. Accordingly, we overrule appellees' third and fourth counterpoints.

By the fifth amendment to the profit sharing plan, adopted December 27, 1965, the rights and duties of Neuhoff Bros. Packers in connection with the plan were transferred to and assumed by the appellee Neuhoff Bros. Packers Management Corporation. Therefore, because of the termination of its connection with the plan, the judgment will be affirmed as to the appel-

lee Neuhoff Bros. Packers, and reversed as to the appellees Neuhoff Bros. Packers Management Corporation and Republic National Bank of Dallas, Trustee, and here rendered in favor of appellant Joe S. Wilson, Jr. and against Neuhoff Bros. Packers Management Corporation and Republic National Bank of Dallas, Trustee, for the sum of $16,256.18, with interest thereon at 6 per cent per annum from December 27, 1968, the date of the judgment appealed from, together with all costs herein.

Affirmed in part and reversed and rendered in part.