**GUARANTY BOND STATE BANK,**
**Appellant,**

v.

**Charles TUCKER, Appellee.**

**No. 17523.**

Court of Civil Appeals of Texas, Dallas.

Dec. 24, 1970.

Rehearing Denied Jan. 8, 1971.

Gordon H. Rowe, Jr., Gardere, Porter & DeHay, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

The original action in the trial court was instituted by Pollock Investments, Inc. against Guaranty Bond State Bank and American Standard Investment Company, Inc., in which the plaintiff sought to recover judgment based upon a guaranty or purchase agreement executed by Guaranty Bond State Bank, by and through its president, Charles A. Tucker, agreeing to purchase a certain promissory note executed by one Wayne McPeters to American Standard Investment Company in the sum of $100,000, said note subsequently having been assigned to Pollock Investments, Inc. The bank defended the action against it on the theory that the letter agreement or guaranty was executed by Tucker without authority, and that such act on the part of Tucker in signing the guaranty letter amounted to a dishonest and fraudulent act. Thereafter, the bank brought a third party action against Tucker and Wayne McPeters based upon the allegation that Tucker had been guilty of a dishonest and fraudulent act in executing the guaranty letter and prayed that it have judgment against Tucker and McPeters in the event judgment was awarded against it on the main cause of action.

The case was tried before the court, without a jury, and judgment was rendered in favor of Pollock Investments, Inc. and in favor of the bank on its third party action against McPeters. No recovery was allowed against the defendant American Standard Investment Company, Inc. The trial court decreed that the bank take nothing against Tucker on its third party petition. Subsequently the bank discharged its obligation on the judgment to Pollock and perfects its appeal solely from that part of the decree denying it recovery against Tucker.

Frank L. Skillern, Jr., Strasburger, Price, Kelton, Martin & Unis, Dallas, for appellant.

The trial court made the following material findings of fact: that in March,

1967 Charles Tucker was president of Guaranty Bond State Bank, a state banking association, in Mount Pleasant, Texas; that he had been president of the bank since January, 1967 and prior to that time had been executive vice-president and associated with such institution since 1946. Tucker was also a member of the Board of Directors of the bank as well as a member of the discount committee which was provided for in the by-laws of the bank. It was the duty of the discount committee to pass upon and approve all loans and discounts for advances of credit in excess of $1,000. Wayne McPeters of Pittsburg, Texas had been a customer of the bank for several years during which time Tucker had personally handled all transactions involving McPeters and the bank. On October 27, 1966 McPeters entered into a contract with one Hagen Parmley whereby Parmley agreed to purchase certain real property from McPeters; Parmley died in December, 1966. In December, 1966 McPeters was indebted to the bank in the principal amount of $23,250 consisting of two promissory notes in the sums of $21,250 and $2,000, respectively. In early January, 1967 McPeters approached Tucker and asked that the bank lend him $100,000 stating that he needed said money in order to complete the Hagen Parmley transaction. At that time Tucker did not lend McPeters any money although Tucker prepared a promissory note in the principal amount of $100,000 payable to the bank and McPeters signed same and gave the bank an assignment of the Parmley contract; the bank did not advance $100,000 or any other sum to McPeters in connection with the note and assignment. On March 7, 1967 Tucker caused the bank to lend McPeters $6,000, $2,000 of which was used to pay the $2,000 promissory note referred to above.

On March 28, 1967 McPeters executed a note in the principal sum of $100,000 payable to American Standard Investment Company. On March 28, 1967 Tucker, as president, and Louise Franklin as cashier, acting on behalf of the bank with the seal of the bank thereon, executed a "take-out letter" addressed to American Standard Investment Company whereby the bank agreed and guaranteed to purchase from American Standard Investment Company, or its assigns, the aforesaid $100,000 note signed by Wayne McPeters. Thereafter American Standard Investment Company assigned the note and the "take-out letter" to Pollock Investments, Inc. Tucker executed the "take-out letter" on behalf of the bank without the specific knowledge of the other members of the bank's Board of Directors. He executed the "take-out letter" without specific authorization from the bank's Board of Directors and without specific approval of the discount committee. Tucker did not enter the "take-out letter" in the bank's books and records, but kept the same in his desk at the bank and removed the same at the time he left the bank as president in January, 1968. At no time prior to his leaving the bank did Tucker tell any other officer or director or employee of the bank of the existence of the "take-out letter".

McPeters received $90,000 net from the proceeds of the promissory note dated March 28, 1967. That sum was sent to Tucker at the bank and deposited therein and distributed as follows: (a) $28,253.24 to pay McPeters' debt to the bank; (b) $219.18 to cover the overdraft of McPeters in the bank; (c) $23,514.82 to Harold J. Smith to discharge an indebtedness; and (d) the balance to the checking account of Wayne McPeters, who spent it in the regular course of business.

At the time Tucker executed the "take-out letter" he was satisfied the obligation was secure on the financial statement of McPeters and on the assignment of the Parmley agreement referred to above.

Based upon these findings of fact the trial court rendered the following conclusion of law: "Under the above facts, Tucker is not liable to the Bank for the Bank's loss in connection with judgment

against it in favor of Pollock Investments, Inc., on the 'take-out letter' ".

Appellant bank seeks reversal of the trial court's judgment denying it recovery against Tucker based upon ten points of error. We have carefully considered these points in the light of the record and authorities presented and have concluded that none of them reflect reversible error. Accordingly, the judgment must be affirmed.

■ By its first two points of error appellant argues that the trial court erred in failing to hold that Tucker had created a "bill payable" on behalf of the bank when he executed the "take-out letter" and that such letter therefore constituted a violation of Article 342–411, Vernon's Ann.Civ. St. of Texas. The article of the statute referred to provides:

"No officer of a state bank shall endorse, pledge, assign, transfer, rediscount or in anywise dispose of any note, bond, security or other obligation held by the bank, nor create any bills payable, unless he shall have previously been duly authorized to do so by the board of directors, as reflected by the minutes of its meeting."

We have been unable to find any Texas cases which define the term "bills payable" as used in the statute. The only two cases cited by appellant in support of its contention of illegality have no application. In W. J. Howey Co. v. Cole, 219 Mo.App. 34, 269 S.W. 955 (1925), the court held that a promissory note is a bill payable within a Missouri statute which prohibited a bank cashier from issuing bills payable without consent of the directors. State Tax Commission v. Shattuck, 44 Ariz. 379, 38 P.2d 631 (1934), dealt solely with the construction of a state statute dealing with taxation which is not comparable to the Texas statute under consideration.

The law dictionary definitions of the term "bills payable" as found in Black's Law Dictionary, 4th Edition, Bouvier's Law Dictionary and Ballentine Law Dictionary with Pronunciations, all seem to limit the definition of the term to commercial paper, as illustrated in the Missouri case cited above. We are inclined to agree with appellee that the legislature did not intend to use the term "bills payable" as meaning all contractual obligations other than those on open account. The statute refers otherwise to "notes", "bonds", and "securities" so that when the term "bills payable" is used in such context it should be construed to mean some similar type of instrument and certainly should not be construed to attempt to regulate ordinary nonbanking transactions which are common to all types of business.

Moreover, by refusing appellant's request to make a finding of fact that the take-out or guaranty letter constituted a violation of the statute the trial court has impliedly held that appellant, charged with the burden of proof, had not established to the satisfaction of the court by preponderance of the evidence that the statute was violated. There was evidence in this record in the form of by-laws of the bank which granted to appellee, as the bank's president, authority generally to perform any and all duties which are commonly performed by presidents of banks. Appellee testified that, in his opinion, he had authority to execute the "take-out letter" in question and that based upon past experience in the bank it was not necessary for him to seek the authority of the discount committee of the bank on all transactions but only on those he was not capable of handling or on those that he needed some advice from the committee. Based upon this record we hold that the court was justified in refusing the request to make the finding of fact concerning the creation of a "bill payable" by Tucker. We also hold that Tucker's act in executing the letter did not constitute a violation of Article 342–411, V.A.C.S.

In its third and fourth points of error appellant contends that the trial court erred in failing to hold that Tucker committed a dishonest and fraudulent act in

executing the "take-out letter" and thereby holding that Tucker was not liable to the bank for its loss in connection with the issuance of such letter. Appellant specifically requested the trial court to make supplemental findings of fact and conclusions of law among which was one to the effect that Tucker committed a dishonest and fraudulent act in executing the "take-out letter" and another to the effect that Tucker is liable to the bank for its loss in connection with the issuance of such letter. The trial court refused these requests.

Implicit in the affirmative conclusion of law by the trial court that Tucker was not legally liable to the bank for its loss occasioned by the "take-out letter" signed by Tucker is the implied finding that Tucker had not committed a dishonest and fraudulent act by his execution of the letter in question. The trial court was not required to make affirmative additional findings where such requests were disposed of either directly or indirectly in the court's original findings. Wentz v. Hancock, 236 S.W.2d 175 (Tex.Civ.App., Austin 1951, writ ref'd). Moreover, the trial court is not obligated to comply with requested findings which were in conflict with findings made by the court. Wagner v. Riske, 142 Tex. 337, 178 S.W.2d 117 (1944); Burnett Trailers, Inc. v. Polson, 387 S.W. 2d 692 (Tex.Civ.App., San Antonio 1965, writ ref'd n. r. e.).

The crucial question presented is, therefore, whether the trial court was legally justified in finding that Tucker did not commit a dishonest or a fraudulent act by his execution of the "take-out letter" and was not therefore legally liable to the bank for the loss occasioned by such letter. That the question of dishonesty is one of fact to be decided by the trier of fact was decided by this court in Wilson v. Neuhoff Bros. Packers, 442 S.W.2d 470 (Tex.Civ.App., Dallas 1969, reversed on other grounds, Neuhoff Brothers Packers v. Wilson, 453 S.W.2d 472 (Tex.1970)). There we discussed the opinion of Justice Cardozo, then Chief Justice of the Court

of Appeals of New York, in World Exchange Bank v. Commercial Casualty Ins. Co., 255 N.Y. 1, 173 N.E. 902 (1930), in which the court said, in part:

"We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. [citing cases] Criminal the act was not, unless done wtih criminal intent. [citing cases] The presence of that intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be 'dishonest,' for dishonesty within such a contract may be something short of criminality. [citing cases] The appeal is to the mores rather than to the statutes. Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. 'Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract.' [citing cases] If this standard is to govern, we think the quality of the teller's act is for the triers of the facts."

That language was quoted with approval by Judge Sanborn, speaking for the Circuit Court of Appeals, Eighth Circuit, in Fidelity & Deposit Co. of Maryland v. Bates, 76 F.2d 160, 167 (1935), in which a case involved alleged dishonest acts on the part of a bank employee named Sloan. The court said:

"Like the question of negligence, the question of dishonesty must be left to the triers of fact if there is a conflict in the evidence, or even if there is no conflict, provided fair-minded men might honestly reach different conclusions. It seems clear to us that, under the evidence, the question as to whether the losses occasioned by the acts of Sloan were due to his dishonesty was a question for the

jury. His acts in allowing overdrafts and in the kiting of checks must have been attributable to at least one of three things: Dishonesty, negligence, or utter incompetence. The jury evidently reached the conclusion that he was not merely negligent nor merely incompetent. They saw the witnesses, including Sloan, and heard them testify. We would have no disposition to disturb their findings, even if we had the power to do so."

Our Supreme Court in Great American Ins. Co. v. Langdeau, 379 S.W.2d 62 (1964), said that to constitute fraudulent and dishonest conduct, the employee must have some degree of intent to perform the wrongful action. There must be the physical act plus the mental state for there to be fraud. The court pointed out that the intent need not be to the degree required for criminal conduct. On the other hand, said the court, mere negligence, carelessness or incompetence is insufficient.

A number of cases from other states and jurisdictions have held that fraudulent or dishonest acts of employees are acts involving bad faith, willfulness, breach of honesty, want of integrity, or moral turpitude affecting official fidelity or moral character of the employee. Hartford Accident & Indemnity Co. v. Singer, 185 Va. 620, 39 S.E.2d 505 (1946); Western Surety Co. v. May Mercantile Ass'n, 131 Colo. 547, 283 P.2d 959 (1955); Charles W. Schreiber Travel Bureau v. Standard Surety & Casualty Co. of New York, 240 App. Div. 279, 269 N.Y.S. 804 (1934).

A careful examination of this entire record clearly demonstrates a conflict in the evidence on the question of fraud and dishonesty on the part of Tucker in the acts complained of by the bank. In deciding whether there is any evidence of probative force to support the trial court's implied and express findings we must view the testimony in the light most favorable to the judgment.

The record is undisputed that Tucker, a banker with several years experience, had always been the officer of appellant bank who handled exclusively the transactions involving McPeters, a customer of the bank. McPeters had made a number of loans with the bank which had been honored. When McPeters came to Tucker in December, 1966 and asked for a $100,000 loan Tucker refused to make the loan in behalf of the bank. He testified that he did not refuse the loan because he thought McPeters would not pay it back. His reason for the refusal was that the bank's loan ratio was very high at that time. McPeters was then indebted to the bank for approximately $25,000. Being refused the loan by Tucker, McPeters suggested that he knew some other people who might loan him the money if the bank would guarantee it with a "take-out letter". Tucker agreed that the bank would issue a "take-out letter" if McPeters could find another source of money. Anticipating developments, Tucker testified that in January, 1967, without advancing any of the bank's money, appellee took a note for $100,000 payable to the bank by McPeters and the same was collateralized by an assignment of McPeters' interest in the real estate contract known as the "Parmley contract". One abortive effort was made to secure the loan from people in Dallas and later Tucker was put in contact with a representative of American Standard Investment Company which company loaned McPeters the desired sum. A note was assigned to Pollock Investments, Inc. The "take-out letter" in question was issued and delivered in connection with this loan. Tucker testified that he executed the "take-out letter" as an alternative to having the bank make the requested loan. Tucker also testified that he issued the "take-out letter" based on (1) a financial statement issued by McPeters showing McPeters' net worth in excess of one million dollars; and (2) the assignment of the benefits of the Parmley contract which Tucker understood was the bank's collateral for the "take-out letter". The net value of the Parmley contract by its terms was in excess of $300,000. Tucker testified that if he had been presi-

dent of the bank at the time the bank was requested to honor the "take-out letter", any money the bank was obligated to pay thereon could have been salvaged from this collateral. Tucker also stated that he believed that at the time he issued the "take-out letter" he was authorized to do so and that otherwise he would not have issued it. He believed the collateral behind it was adequate. He testified he received no personal benefit from the transaction. Tucker also testified that he had had no prior experience with "take-out letters" and that the wording of the letter was supplied to him by the lending agency. As to the reason why he did not enter the transaction on the records of the bank or otherwise bring it to the attention of the directors of the bank Tucker testified that in his opinion the "take-out letter" was not a present obligation and that the bank would have no liability until the time it was requested to honor the letter and purchase the note. Although he admitted he took his copy of the "take-out letter" when he left his employment with the bank he stated he did not know whether or not there was a copy at the bank. Afterwards, he did on his own initiative, bring the existence of the "take-out letter" to the attention of the directors. Summarizing the situation Tucker testified:

"All I would like to say is this: the action that takes place on my part, I have never received any personal remuneration for benefits from it. It was strictly a business transaction that would benefit the Bank as evidenced by the deposit ticket here which has been admitted by the Court with no attempt to conceal the $90,000.00 and there has been no attempt on my part to conceal any of the proceeds, where the $90,000.00 went to the Bank debit and were applied against Mr. McPeters' Account.

"Maybe that could be judged in terms of—as a matter of bad judgment, but you know hindsight is better than foresight they say, but I didn't have that.

"Finally, I have been in this particular Bank since 1946. I have never encountered any serious problems with the Board of Directors or anybody connected there until 1967 or shortly thereafter when the Bank's stock began to change hands and the other stockholders gradually stepped out of the picture. What I'm trying to say is: I have made no attempt here to try to conceal anything. If I did anything here that's construed as that, it was strictly a misunderstanding or ignorance on my part."

One of the attorneys for the appellant testified, concerning Tucker, that he found Tucker to be honorable and honest and upright in all of his dealings with him.

In the light of this testimony we cannot say that the record demonstrates Tucker to have committed a fraudulent and dishonest act, as a matter of law. Neither can we say that there was no evidence of probative force to support the finding of the trial judge to the effect that Tucker was not guilty of fraudulent and dishonest acts which led to the loss occasioned by the appellant bank. It is not for us to say what we would have found had we been sitting as trier of the facts nor for us to substitute our judgment for that of the trial judge. The trial court heard the testimony, saw and observed the witnesses, and exercised his right to decide the issues of fact and make appropriate conclusions based thereon. We cannot disturb these findings.

■ Finally, appellant in a number of points complains of the action of the trial court in denying additional findings of fact. We have carefully examined each of these requests and find that the same are either evidentiary or amount to request for findings which have already been expressly or impliedly found by the trial court. Rules 296 and 298, Vernon's Texas Rules of Civil Procedure, govern the matter of findings of fact and requests for additional findings. These rules require that the trial court make only findings concerning the

ultimate and controlling issues of fact raised by the pleadings. Findings need not be made on issues that are evidentiary or incidental. Moore v. Campbell, 254 S.W.2d 1018 (Tex.Civ.App., Austin 1953, writ ref'd). No findings need be made on undisputed facts. City of Corpus Christi v. Arnold, 424 S.W.2d 492 (Tex.Civ.App., Corpus Christi 1968, writ ref'd n. r. e.).

Even if it could be said that one or more of the requested findings should have been granted by the trial court yet appellant has not demonstrated that such refusal was reasonably calculated to cause and did cause the rendition of an improper judgment. Rule 434, T.R.C.P.; Hoyt v. Geist, 364 S.W.2d 461 (Tex.Civ.App., Houston 1963).

The judgment of the trial court is affirmed.