The Home Indemnity Company, a Corporation, Plaintiff-Appellant, v. Reynolds & Co., a Partnership, Defendant-Appellee.

Gen. No. 48,604.

First District, Third Division.
November 28, 1962.
Rehearing denied January 31, 1963.

359

363

Clausen, Hirsh, Miller & Gorman, of Chicago (Donald N. Clausen, and Jerome H. Torshen, of counsel), for appellant.

Winston, Strawn, Smith & Patterson, of Chicago (Douglas C. Moir, Edward J. Wendrow, and Edward L. Foote, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

The Home Indemnity Company issued brokers blanket bonds and a liability policy to Reynolds & Co., a partnership, brokers and dealers in stocks and commodities. The bonds contained a fidelity provision which insured Reynolds against loss incurred through any dishonest, fraudulent or criminal acts of its employees. It excluded losses resulting from similar acts of partners. The liability policy indemnified Reynolds for judgments obtained against it by customers who sustained damages through the acts of either employees or partners arising from the ordinary course of business.

The controversy arose because certain salesmen in Reynolds' Chicago office sold securities in violation of the Illinois Securities Act, Ill Rev Stats (1955), c 121½, § 137.1, et seq. Reynolds made good the losses suffered by its customers and turned to Home Indemnity for reimbursement. The company took the position that the illegal sales were made with the knowledge and approval of supervisory officials and partners in both the Chicago office and the main office in New York, and that the sales came under the exclusion of the fidelity provision of the blanket bonds because the partners participated in them. As to the liability policy, its position was that the repayments made by Reynolds to its customers were rescissions

of the security transactions and were not covered by the policy.

The litigation started as an action for declaratory judgment by Home Indemnity. It sought a finding that it was not obligated under the bonds or the policy. Reynolds filed a two-count counterclaim which asked judgment under the $500,000 and $1,500,000 fidelity bonds and judgment under the $50,000 liability policy.

Later Home Indemnity moved for summary judgment. Counter-affidavits were filed and the motion was denied. Before the case went to trial Home Indemnity renewed its motion for summary judgment on the further ground that there were discrepancies between the counter-affidavits and the pre-trial depositions of certain Reynolds officials. The motion was again denied.

A jury trial resulted in a verdict in favor of Reynolds with damages assessed at $199,351.91. The court entered judgment on the counterclaim and dismissed the complaint for declaratory judgment. This appeal followed. The principal points are that the court erred in not granting Home Indemnity's motions for summary judgment and in not directing a verdict in its favor. Subordinate points concern instructions, rulings on evidence and the construction given the word "damages" in the liability policy.

The contention that the trial court erred in denying the motions for summary judgment poses an unusual question. Does a party, whose motion for summary judgment is denied, have the right to have the denial of its motion reviewed after the case goes to trial and a verdict is returned against it? Neither side supports its position with authority; both argue what the law should be.

Rather than determining if Home Indemnity was entitled to summary judgment we will, for the purpose

of reaching the substance of the issue presented, make two assumptions: (a) that one or both of its motions should have been granted and (b) that the verdict in favor of Reynolds was not against the weight of the evidence. Obviously, under these assumptions the evidence must have differed at the time of the motions and at the time of the trial. Obviously, a greater quantity or a better quality of evidence was produced by Reynolds at the trial than on the motions.

 An incorrect ruling deprived the moving party of a judgment it should have had. It could not immediately appeal from the orders denying its motions because the orders were not final and appealable. Kern v. Chicago & E. I. Ry. Co., 31 Ill App2d 300, 175 NE2d 408; McGrath v. Hunt, Hill & Betts, 194 F2d 529 (CA 2). If it cannot appeal after judgment, if it does not come under the rule that an Appellate Court may review interlocutory orders (where a separate appeal did not lie from such orders, 2 ILP, Appeal and Error, sec 651), what remedy does it have? To deny a review seems to be unjust. But to grant it would necessarily result, under our first assumption, in the finding that the judgment entered upon the verdict should be set aside and that judgment should be awarded upon one of the motions. This would be unjust to the party that was victorious at the trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised.

The greater injustice would be to the party which would be deprived of the jury verdict. Otherwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence. This would defeat the fundamental purpose of judicial inquiry.

■■ We hold that if a motion for summary judgment is improperly denied the error is not reversible for the result becomes merged in the subsequent trial. Therefore, even if an examination of the affidavits, counter-affidavits, depositions and exhibits were to lead to the conclusion that either one or both of Home Indemnity's motions should have been granted it would avail nothing, for the error cannot be reviewed.

■ The second point raised on this appeal is the denial of the motion for a directed verdict. The test to be applied to a motion for a directed verdict is whether there is in the record any evidence or reasonable inferences arising therefrom which tend to prove the case of the party against whom the motion is directed. Hughes v. Bandy, 404 Ill 74, 87 NE 2d 855; Lindroth v. Walgreen Co., 407 Ill 121, 94 NE 2d 847. In a jury trial, the court cannot weigh the evidence or the inferences but must resolve all controverted questions of fact in favor of the person who opposes the motion. The credibility of the witnesses and the weight of their testimony are questions for the jury. Molloy v. Chicago Rapid Transit Co., 335 Ill 164, 166 NE 530. The court must decide if the evidence fails as a matter of law to establish the claim or defense. This becomes a question of law only where the evidence is such that reasonable men would reach the same conclusion or where there is a total failure to prove one or more of the elements necessary to establish the claim or defense. Lutz v. Chicago Transit Authority, 36 Ill App2d 79, 183 NE2d 579.

The evidence in this case showed that three securities were involved, all unlisted on stock exchanges of the United States, all low-priced and all selling in the over-the-counter market in New York. The far greater sales were of Rare Earth Mining stock. Almost all of these sales in Reynolds' Chicago office were made by two salesmen (also known as "account

executives" and "registered representatives") William Rothbart and his son Jordan, and were made during March, April, May and June, 1956. Our discussion will be limited to Rare Earth Mining and what is said about it will apply generally to the other two stocks.

■ ■ Rare Earth Mining stock was registered with the United States Securities and Exchange Commission, was qualified for sale. in New York and in some other states, and was listed on the Toronto Stock Exchange. It was sold by Reynolds' New York office and in branch offices throughout the country. However, it had not been registered in Illinois and, under Illinois law, solicited sales of the security were prohibited. A solicited sale is one in which the salesman "actively encourages the purchase or sale of a security by a client." Unsolicited sales, in which a customer requests that a security be purchased for him and the salesman just takes the order and acts as agent for the purchaser, are not prohibited. Ill Rev Stats (1955), c 121½, § 137.4N. The sales made by the Rothbarts were solicited and hence were in violation of the statute.

Two factual issues and two legal issues developed during the trial. The factual issues were: (1) where the responsibility rested for ascertaining if the stock was registered in Illinois and (2) whether the sales were made with the approval or knowledge of the partners. The legal issues were: (1) whether the acts complained of were dishonest or criminal and (2) whether they came within the exclusion of the bonds because of what the partners did or failed to do.

The evidence in behalf of Home Indemnity was that the responsibility for finding out whether securities were qualified in Illinois rested upon two employees, Louis Maged and Robert Whittaker. Maged was located in the New York office and it was his duty

to supervise compliance with state laws, Security and Exchange Commission regulations and stock exchange rules. He was the "policeman" of the Reynolds organization and the authority to be consulted on stock registration and regulatory matters. Daily reports of securities sold were channeled over his desk. Whittaker was the manager of the Chicago office. Two bulletins, issued by Reynolds were relied upon as fixing his responsibility. One, dated July 15, 1955, was addressed to "All Partners, Correspondents, Branch Office Managers, Registered Representatives and Personnel," and concerned procedures in low-priced stocks. It stated:

"7. Before entering any buy order for stocks referred to in this bulletin, it will be the sole responsibility of the Office Manager to ascertain that such security is qualified in the state in which the customer resides."

Another, dated February 3, 1956, prepared by Maged and addressed to "All Partners, Registered Representatives, and all Wires" also pertained to low-priced stocks. It contained the following regulation:

"(d) It is the sole responsibility of the branch office managers to ascertain whether or not questionable speculative securities are qualified in the State in which the customer resides."

The evidence in behalf of Reynolds was that the responsibility rested on the salesmen. Maged, who was no longer employed by Reynolds, testified that in each state the salesmen knew the local law better than he did, that his bulletin of February 3, 1956, was directed to registered representatives and it was their duty, as well as that of the branch office managers, to carry out the regulation. Whittaker, who also was no longer employed by Reynolds, was called as a wit-

369

ness by Home Indemnity. He testified that despite the instruction in the bulletin of July 15, 1955, the Chicago sales force was told that the prime responsibility was on their shoulders. Partners of the Reynolds firm testified that it was the salesmen's primary responsibility to see that sales in over-the-counter stocks were not forbidden and that this responsibility increased if salesmen recommended a security and solicited its purchase. One said: "The chain of responsibility started with the account executive. The next link in the chain of command is the local office manager." The testimony showed that William Rothbart had at least thirty years experience in the security business and that Jordan Rothbart had been through a six-month's training course and had passed an examination given by the New York Stock Exchange. The testimony further disclosed that a bulletin issued in February 1956 by the Secretary of State of Illinois, was distributed among the Chicago salesmen and was posted on the Reynolds' bulletin board. The bulletin, introduced in evidence by Reynolds, called attention to section 137.4N of the Illinois Securities Law and warned that solicited sales of unregistered stock were not exempt under the law.

In reference to the second issue, whether the sales were made with the approval or knowledge of the Reynolds' partners, the partners who testified said they did not know that the sales were made or solicited. They said that their New York office processed between 2,000 and 3,000 transactions each day, that their firm dealt in securities of at least 3,000 different companies in a six-month period and that between 25,000 and 50,000 separate stocks were traded in the over-the-counter market. They testified that the records of their firm would show the sales made but would not show if the sales had been solicited, and that they would have no means of knowing about the

latter unless their salesmen's telephone calls were monitored. They said they had to trust the salesmen and rely upon their good judgment.

■ Home Indemnity's evidence on this issue was that Rare Earth had been sold in 19 Reynolds' offices by 68 different salesmen, that the daily reports given to Maged listed these sales, that Maged himself had bought 500 shares in February 1956, that William Rothbart had consulted Maged about the stock and had been introduced by Maged to the underwriter and to the specialist who handled the stock in the over-the-counter market. Home Indemnity also placed much reliance on statements made in pre-trial depositions by Reynolds' partners and employees which it believed were inconsistent with their testimony at the trial. But neither contradictory evidence nor statements made prior to trial in depositions or otherwise, allegedly inconsistent with testimony given at the trial, can be considered on a motion for a directed verdict. Offutt v. World's Columbian Exposition, 175 Ill 472, 51 NE 651; Schiff v. Oak Park Cleaners and Dyers, Inc., 9 Ill App2d 1, 132 NE2d 416.

■ The two issues were material to the case and there was substantial evidence on behalf of each party; but standing alone, the Reynolds' version supported the allegations of its counterclaim. Therefore, as far as the factual issues were concerned the court correctly denied the motion for a directed verdict.

The next inquiry is whether the facts most favorable to Reynolds established the legal elements essential to recovery under the bonds and the policy. This also has two aspects: the protection given for acts of employees and the exclusion for acts of partners. We will confine our inquiry to the bonds. If the judgment can be upheld under these bonds, which amply cover the amount of the judgment, there will be no reason to examine the liability policy with its

limited coverage, or to review the point raised on this appeal concerning the construction given that policy.

The bonds insured Reynolds against:

> "(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees."

As there was no evidence of fraud in anything the salesmen did, we need not consider the word "fraudulent." The words "dishonest" and "criminal" are not defined and the question arises whether the transactions were either dishonest or criminal under the terms of the bonds.

The word "criminal" looms as the more important. It must appear in the bonds for some purpose. It must refer to acts of employees which violate public laws, as distinguished from those acts generally characterized as fraudulent or dishonest. It was stipulated that the Rothbarts solicited the purchase of Rare Earth and, as we have seen, such solicitation is prohibited by law. The statute further states:

> "It shall be a violation of the provisions of this Act for any person:
>
> "A. To sell any security except in accordance with the provisions of this Act;" (Ill Rev Stats (1955), c 121½, § 137.12A) and
>
> "Any person who violates any of the provisions of sub-sections A . . . of Section 12 of this Act [sec 137.12A] shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $5,000 or, if a natural person, imprisoned in the county jail not exceeding one year, or both." (Sec 137.14A.)

372

The solicited sales were misdemeanors and misdemeanors as well as felonies are criminal acts. People v. Barg, 384 Ill 172, 51 NE2d 168.

Home Indemnity argues that although the acts may have been nominally criminal they were not actually so because they were not performed with criminal intent or improper motive, were neither hostile nor unfaithful to the Reynolds firm and were not criminal within the contemplation of the bonds, because the bonds were not intended to protect the broker against technical violation of security laws.

██ ██ Soliciting the sale of an unregistered security is proscribed by the statute. The prohibition against solicited sales is unqualified. No motive, no knowledge that the security is unregistered, no intent to defraud the purchaser, no particular mental state and no specific intent to violate the law is required. The statute was designed to prevent injury to the investing public and it indicates a legislative purpose to impose absolute liability for its violation. This is borne out by another section of the statute applying to those who assist in unlawful sales. Here, there is a qualification; liability does not attach unless the assistance is given *knowingly*. The statute states: ". . . all persons . . . who shall in any manner knowingly authorize, aid or assist in any unlawful sale . . . shall be deemed guilty. . . ." (Sec 137.14D.)

██ A criminal offense consists in a violation of a public law, in the commission of which there shall be a union or joint operation of an act and intention. Ill Rev Stats (1955), c 38, § 588. The criminal intention may be manifested by the circumstances connected with the perpetration of the offense without any positive testimony concerning the intention. Ill Rev Stats (1955) c 38, § 589. There were sufficient circumstances from which the jury could have inferred that the acts were done with criminal intent. The

salesmen knew from experience and training and from the Secretary of State's bulletin, which was displayed to them just a month before they started selling Rare Earth, that soliciting the sale of an unregistered security was a violation of the law. An unlisted and a relatively unknown security should have raised a warning signal in their minds. They should have ascertained from Maged or from the State of Illinois if the stock was qualified. Consciousness of guilt could be inferred from the nature of their conduct when the investigation of the sales was started. They first denied—the now undisputed fact—that the sales were solicited. This attempt to conceal their misdeeds was not consistent with innocence and the lack of criminal intent.

This case differs from World Exchange Bank v. Commercial Casualty Ins. Co., 255 NY 1, 173 NE 902, the one case cited by Home Indemnity in which the words "criminal act" in a fidelity bond are construed. A paying teller permitted a depositor to draw on an account made up in part of checks which had not been collected. Some of the deposited checks were genuine but some turned out to be forged. The bank contended that, as a matter of law, the teller was guilty of a dishonest and a criminal act for permitting withdrawals against uncollected items of deposit. The court observed:

> "We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. [Citation.] Criminal the act was not, unless done with criminal intent. [Citations.] The presence of that intent is not, in the setting of these circumstances, an inference of law."

In the World Bank case the act of the employee did not violate a penal statute; recovery was sought for an act which was contrary to the rules of the em-

374

ployer bank. The court found that the act was not of itself criminal and also that (unlike the present case) criminal intent could not be inferred from the circumstances proved.

 The word "dishonest" when used in fidelity bonds has been interpreted in many cases. It has been held that it is to be given a broad meaning and that it includes: "an act manifestly unfair to the employer and palpably subjects him to the likelihood of a loss," one which "indicates a reckless, wilful and wanton disregard for the interest of the employer" and "wrongful acts which, athough not criminal, nevertheless display significant lack of probity, integrity or trustworthiness." The same cases hold that to be dishonest the act "need not be such as would involve criminal liability of the employee for its commission" and that "it is not a necessary condition that the employee personally profited by his acts." On the other hand, it is said "mere negligence, mistake or error would not ordinarily be considered a dishonest act" and "acts resulting from incompetence cannot be characterized as dishonest." If reasonable men can differ whether the acts were dishonest, within the wide scope of that word, the question is one of fact for the jury. London and Lancashire Indemnity Co. of America v. Peoples Nat. Bank & Trust Co., 59 F2d 149 (CA 7); Irvin Jacobs & Co. v. Fidelity Deposit Co. of Maryland, 202 F2d 794 (CA 7); Mortgage Corp. of N. J. v. Aetna Cas. & Surety Co., 19 NJ 30, 115 A2d 43. The evidence favorable to Reynolds brings this case within the authority of these decisions. As an employer Reynolds had the right to expect that its employees would perform their work with honesty and fidelity. It paid insurance premiums to protect itself against loss caused by the lack of these qualities. The acts of the salesmen were detrimental to the firm, disregarded its best interests and subjected it

375

to heavy losses. Since the acts complained of could be held to be both criminal and dishonest, the court, on this phase of the case, properly refused to direct a verdict.

 The remaining question under the directed verdict issue is whether the acts came within that part of the bond which reads:

"THIS BOND DOES NOT COVER:

"(c) Any loss resulting directly or indirectly from the act or acts of any person who is a member of the Board of Directors of the Insured or a member of any equivalent body by whatsoever name known . . . or any loss resulting directly or indirectly from any dishonest, fraudulent or criminal act or acts of any partner of the Insured."

In its affirmative defense to Reynolds' counterclaim, Home Indemnity charged that the sales were the result of dishonest or criminal acts of the partners. This position could not be very well maintained in the face of its own contention that the acts of the salesmen themselves were neither dishonest nor criminal. While the charge was repeated in its main brief, the untenable point has been definitely abandoned in its reply brief. It is there stated:

"It is thus unnecessary to determine whether any of the individual partners committed dishonest, fraudulent or criminal acts within the terms of the exclusion clause. That clause . . . is not involved here."

The present argument, therefore, must be regarded as confined to the provision that there can be no recovery for loss resulting directly or indirectly from the act

or acts of any person occupying a position equivalent to a member of a board of directors.

▊▊ The record does not show any direct or affirmative act by the partners which would make them responsible for the solicited sales. The indirect acts are said to be three, (1) knowledge of the sales, (2) implied approval of them and (3) negligent supervision of the salesmen. The first and second are combined in the argument that the partners knew of the sales, did nothing to stop them and thereby tacitly approved them. The law will not permit one to profit from his own wrong and there can be no recovery under a fidelity bond if the insured has knowledge of, has countenanced, has acquiesced in or participated in the wrongful acts of his employees. Levey v. Jamison, 82 F2d 958 (CA 4); Fidelity and Cas. Co. v. Hoyle, 64 F2d 413 (CA 4). It is insisted that the sales were known to the partners because they were openly and routinely made or, in the alternative, that they were known to Maged and Whittaker, whose knowledge was received in the ordinary course of business and within the scope of their employment, and that their knowledge must be imputed to the partners.

▊ There are flaws in both of these contentions. First, they are based on evidentiary assumptions which the trial court could not make upon the motion for a directed verdict. Instead of assuming that the partners or Maged and Whittaker knew the sales were made, the trial court had to accept their testimony that they did not know. Second, it was not the sales which were criminal or dishonest—it was the solicitation of the sales. Third, if the rules pertaining to directed verdicts were otherwise and if Home Indemnity's evidence could be considered, and if an inference might be drawn that the sales were known to Maged, Whittaker or maybe to some one of the partners, still there was no evidence, and no reason-

377

able inference could be drawn from any evidence, that Maged, Whittaker or any partner knew the sales were solicited.

The third argument is that the partners should have known of the illegal sales and that they would have known except for inattention to business, inadequate supervision and noncompliance with the duties which were theirs under regulations established by the security industry.

██ That the partners were negligent is a conclusion reached not from evidence but from the fact that unlawful sales were made. Mere negligence is not sufficient to defeat recovery under a fidelity bond. 45 CJS, sec 801, p 849; 50 Am Jur, Suretyship, sec 342, p 1131. The bonds say nothing of the degree of care which was to be exercised by the insured. If, in the absence of some contractual obligation, such complete supervision were to be required that no employee could commit a dishonest act, Reynolds would have no need for fidelity bonds. The exclusionary clause had no application to the facts of the case and Home Indemnity's motion for a directed verdict was correctly denied.

██ This brings us to the two remaining points concerning instructions and rulings on evidence. Home Indemnity called Whittaker as its own witness. His testimony differed in some respects from what he had said in a discovery deposition. Home Indemnity sought to call his attention to his prior statements in order to refresh his memory. The record indicates that the witness' memory did not need refreshing. It is now urged that the court erred in not permitting the witness' attention to be directed to his prior statements for the purpose of awakening his conscience and that the statements should have been admitted as admissions against interest. There was no claim at the trial that the interrogator was taken by surprise by Whit-

378

taker's answers and there was no request that cross-examination be permitted to awaken his conscience. At the time of the deposition Whittaker was an employee of Reynolds; at the time of the trial he was not. What he may have said at the deposition was after the transactions complained about were completed, were not within the scope of his employment, would not be made with the authority of his principal and would not be binding upon the latter. There was no error in refusing to permit the cross-examination which would have resulted in an attempt by Home Indemnity to impeach its own witness.

█ █ On the other hand, Home Indemnity tried to introduce as an admission against interest a statement made in a discovery deposition by John G. White, the resident partner of Reynolds in Chicago. In the deposition he said that the directive in Maged's bulletin of February 3, 1956, that it was the sole responsibility of the office manager to ascertain if securities were qualified, gave him much concern. He talked with Whittaker, with Maged and with his partners about this. He said that the conclusion was reached that there was no local responsibility for seeing if stocks were qualified if the stocks were selling for more than $2 a share. The purport of this is said to be an admission that the responsibility was Maged's and not the salesmen in Chicago. To the extent that this was an admission, it should have been received. The admissions of a partner in matters relating to the affairs of a partnership are admissible in evidence. Ill Rev Stats (1955), c 106½, § 11; Grunenberg v. Smith, 58 Ill App 281. We fail to see, however, under all the evidence in this case where the refusal to receive this attenuated admission was anything but an inconsequential error.

█ Error is charged in the rejection and submission of instructions. We find no error in the court's

refusal of instructions but do in the instructions given. One of these follows:

"You are instructed that the Brokers Blanket Bond issued by the Home Indemnity Company was in full force and effect during the time involved in this case and that the same bond covered:

'Any loss through any dishonest, fraudulent or criminal act of any of the employees of Reynolds and Company.'

"The words dishonest and fraudulent as used in reference to conduct referred by the bond do not embrace mere carelessness in the discharge of duty, but they do include any acts done in violation of the employee's obligation faithfully to perform the duties of his job, whether such acts be criminal or not. They include acts of an employee which evince a want of integrity and intentional breach of trust, and acts which are in violation of instructions and in reckless disregard of the interests of his employer. Any acts done in breach of William Rothbart's and Jordan Rothbart's duties to Reynolds and Company and any wilful omission of William Rothbart and Jordan Rothbart to discharge the duties of their positions with Reynolds and Company are dishonest acts within the meaning of the bond on which this action is brought. In determining whether William Rothbart's or Jordan Rothbart's conduct was dishonest and fraudulent you may take into consideration any conduct of William Rothbart and Jordan Rothbart inconsistent with faithful service to Reynolds and Company."

The statements ". . . but they [i. e., the words dishonest and fraudulent as used in the bonds] do include *any* acts done in violation of the employees

380

obligation faithfully to perform the duties of his job," and *"Any* acts done in breach of . . . duties . . ." and ". . . you may take into consideration *any* conduct . . ." are too sweeping. They do not correctly reflect the law but are interwoven with statements which do. Every breach of duty, no matter how minor, and every act not consistent with faithful service, no matter how slight, would not be dishonest and certainly would not be fraudulent. The insured is not entitled to recover for every infraction of its rules.

Another instruction given was the following:

> "You are instructed that the failure, if any, of the partners of Reynolds and Company to discover that the sales of the securities in question were made in violation of the Securities Law of Illinois and any negligence or, inattention, if any, by the partners of Reynolds and Company would not be a defense to its claim against the Home Indemnity Company."

Here again is a statement much too broad. Although negligence or managerial inattention is not a defense to an action on a fidelity bond, we are not ready to concede that *any* negligence, no matter how flagrant, could not be.

 While both of these instructions were improper, we do not believe, under the evidence, that they were so misleading as to be reversible. The propriety of an instruction depends upon the nature of each case. The evidence concerning the salesmen centered around the solicited sales of the securities. These were the dishonest acts, the criminal acts upon which recovery depended. The trial was concentrated upon this issue. A minor claim under one bond was that the same salesmen, without customer authorization, traded in the accounts of three customers. Reynolds' loss because of this was some $6,000. This loss was

not controverted. Thus, both the major and the minor claims were predicated on acts which were not in dispute. There was, therefore, no other breach of duty, unfaithful act or wayward conduct which the jury could have considered. If there had been, if the jury had a choice between acts which are considered dishonest under the law as it applies to fidelity bonds and acts which are not so considered, the instruction would have been misleading. The second instruction, although too broad, could not have harmed Home Indemnity. As we have stated, there was no affirmative evidence that Reynolds was negligent in not preventing the solicited sales or in failing to discover them. Hence there was no occasion for the jury to compare acts of ordinary negligence, which would not preclude recovery, with negligent acts so serious that they might constitute a defense.

The judgment of the Superior Court is affirmed.

Judgment affirmed.

McCORMICK, J., concurs.

SCHWARTZ, J., took no part.