**CENTRAL NATIONAL LIFE INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant-Appellee in No. 78–1768, Appellant in No. 78–1769,**

v.

**Louis K. RISKEN and C. Ritchey Smiley, Third Party Defendants in No. 78–1768, Appellees in No. 78–1769.**

Nos. 78–1768, 78–1769.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1979.

Decided July 9, 1980.

Richard L. Blatt, Chicago, Ill., for plaintiff-appellant.

Edward P. McNeela, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, SPRECHER, Circuit Judge, and HOFFMAN, Senior District Judge.*

WALTER E. HOFFMAN, Senior District Judge:

This is an appeal from the granting of a motion for summary judgment [1] in favor of Fidelity and Deposit Company of Maryland (Fidelity) in an action filed by Central National Life Insurance Company (Central National) on a fidelity bond whereby Fidelity agreed to indemnify Central National for any loss incurred due to the dishonest or fraudulent acts of Central National's employees. In turn, Fidelity, while denying

---

* The Honorable Walter E. Hoffman, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

1. The district court merely entered an order granting the motion with final judgment for Fidelity. The judge did not write an opinion stating his reasons, a procedure permitted by Rule 52(a), F.R.C.P., but not of benefit to an appellate court.

any liability to Central National, filed a third party action against Louis K. Risken and C. Ritchey Smiley, two of the three group agents who allegedly conspired with one Leon Clough, Central National's group vice president, the employee who allegedly committed the dishonest or fraudulent acts.[2]

The issue presented on summary judgment was not whether Clough committed dishonest or fraudulent acts which resulted in a loss to Central National. In fact, for the purposes of this case at its present stage, Fidelity concedes that such occurred.[3] What Fidelity claims is that Central National failed to comply with three conditions precedent to the imposition of liability upon Fidelity in that Central National failed to (1) give notice within a reasonable time after discovery of its alleged loss, (2) file a Sworn Proof of Loss within six months after discovery of the alleged loss, and (3) bring legal proceedings for recovery within twenty-four months from the date of the discovery of the alleged loss. These defenses resolve themselves into a single issue. When was the loss resulting from dishonest or fraudulent acts discovered?[4]

2. Fidelity filed a protective notice of appeal in No. 78–1769 from the action of the court in dismissing the third party complaint after summary judgment had been granted. By reason of our conclusion reached as to the controversy involving Central National and Fidelity, we likewise reverse the court's action in dismissing the third party complaint.

3. The fidelity bond covers, as pertinent: "Any loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees."

4. The bond provides under Section 4: "At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Under-

## SUMMARY JUDGMENT

In *American Surety Company v. Pauly (No. 1)*, 170 U.S. 133, 144, 18 S.Ct. 552, 556, 42 L.Ed. 977 (1898),[5] it is said:

If, looking at all its provisions, the bond is fairly and reasonably susceptible of two constructions, one favorable to the bank and the other favorable to the Surety Company, the former, if consistent with the objects for which the bond was given, must be adopted, and this is for the reason that the instrument which the court is invited to interpret was drawn by the attorneys, officers or agents of the Surety Company. This is a well established rule in the law of insurance.

Equally well settled is the fact that summary judgment under Rule 56, Fed.R.Civ.P., should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy *or the inferences to be drawn from such facts.* *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Accordingly, even though there may be no dispute about the basic facts, still summary judgment will be inappropriate, if the parties disagree on the inferences which may reasonably be drawn from those undisputed

writer nor after the expiration of twenty-four months from the discovery of such loss. . . ."

Section 12 provides in part: "This bond shall terminate as to any Employee—(a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Employee. . . . "The district court obviously did not grant summary judgment based upon Section 12 which has not been quoted in its entirety.

5. The cited case, and *American Surety Company v. Pauly (No. 2)*, 170 U.S. 160, 18 S.Ct. 563, 42 L.Ed. 987 (1898), suggest many of the factual features present in the instant case. The cases involve delayed notices, and approved jury charge, the time when plaintiff "became satisfied that the cashier had committed dishonest or fraudulent acts", and that mere suspicion of irregularity or fraud did not require notice to the bonding company until knowledge was acquired of "some specific fraudulent or dishonest act which might involve the defendant [employee] in liability for the misconduct." Throughout the two opinions the Supreme Court pointedly suggests that these issues are for the jury.

facts. *Winters v. Highlands Ins. Co.*, 569 F.2d 297, 299 (5th Cir. 1978): *Exnicious v. United States*, 563 F.2d 418, 423–24 (10th Cir. 1977).[6]

We make no suggestion as to the final result of this case. We conclude solely that, on the record presently made, the district court should not have decided the disputed issues in the case by summary judgment.

## THE FACTUAL SITUATION

Leon Clough was first employed on March 10, 1969 by Central National as the manager of Central National's Group Insurance Department. On February 2, 1970, he was elevated to the position of Vice President in charge of the Group Insurance Department. As such, Clough was vested with wide authority in fixing rates, selecting agents, approving presigned policies, etc. A large number of policies were issued through the agencies of Risken, Smiley and Pigg.[7]

Clough, in fixing the rates for the risks involved, specified low rates in several instances, thus resulting in losses to Central National which became known in the late spring or early summer of 1971. For example, he established the Western Conference group rate at 47 cents per thousand dollars of coverage, whereas it should have been 94 cents per thousand. As management had advised Clough when he was hired, Clough was to consult with Central National's actuary before making quotations on groups whose monthly premiums were equal to or in excess of $3000; and was further told to use Central National's reinsurer's manual (the Lincoln National table) in quoting rates on groups whose monthly premiums did not reach $3000. Moreover, Clough was instructed not to guarantee rates beyond a period of 12 months. He was likewise requested to develop commission schedules for Central National.

Undeniably, Clough violated these instructions. When the low rate on the Western Conference group came to light, he was reprimanded and told not to repeat such a practice.[8] Thereafter, other transactions became known, including a subsequent attempt to again quote a low premium to another group, the awarding of excessive commissions to agents, the guarantee of rates beyond 12 months, and his general failure to follow instructions.

On August 25, 1971, Clough's employment by Central National was terminated. His personnel file assigned "Misconduct" as one of the reasons for his discharge. The Board of Directors authorized the discharge at a meeting on that date.[9]

6. Where intent is a controlling element, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be judged by the trier of facts after observation of the witnesses during direct and cross-examination. *Schmidt v. McKay*, 555 F.2d 30, 37 (2nd Cir. 1977); *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977), where it is said: "Generally, when intent is at issue, a jury should be allowed to draw its own inferences from the undisputed facts unless all reasonable inferences defeat [the plaintiff's] claim;" *Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 491 (4th Cir. 1973); *Croley v. Matson Navigation Company*, 434 F.2d 73, 77 (5th Cir. 1970), *petition for rehearing denied* 439 F.2d 788 (5th Cir. 1971). See also, *Cram v. Sun Insurance Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967), where the issue of intent relates to an ambiguous contract or document.

7. Pigg died after the commencement of this action. His estate was not made a party to the third party complaint.

8. The affidavit of Harris Rowe, Chairman of the Board of Central National, states that it was not until April 10, 1975 that plaintiff became aware of the widespread practice of Clough in quoting rates lower than what would have been approved by Bruce, Central National's actuary, on the larger amounts of monthly premiums.

The affidavit of James Willhite, Clough's successor in the Group Department, was to the effect that plaintiff first discovered the widespread practice of Clough in quoting lower rates for the premiums not in excess of $3000 monthly in January, 1975 by comparing Clough's rates with the Lincoln National tables which corresponded with Central National's reinsurer's manual.

9. The Board Minutes recite:
The Executive Committee considered the mounting problems created by the irregularities discovered in the group department.

Harris Rowe, the Chairman of the Central National's Board, thereafter interviewed Risken, an agent who had written a substantial number of group policies through Clough, and inquired whether or not Risken had made any payments of money to Clough. Risken assured Rowe that he had not. This occurred in September, 1971.

Subsequently, Central National became involved in litigation with several groups on policies written by Risken as agent. During the course of discovery proceedings in one of these cases Central National learned, for the first time on December 9, 1972—nearly sixteen months after Clough's termination—that Clough had been receiving money from the three group agents, including Risken. The payments were on a periodic basis, nearly monthly, commencing December 12, 1969 and ending October 28, 1971, and aggregated approximately $45,000.

The first written notice given by Central National to Fidelity was on February 5, 1973. Thereafter, on May 11, 1973, Central National filed with Fidelity its sworn Proof of Loss. Central National and Fidelity then stipulated that the time for filing suit was suspended as of October 15, 1973 with the understanding that if the time for filing suit had already expired as of October 15, 1973, the defense that the suit was barred by reason of the two year bond limitation for filing suit would not be waived. The action was filed on September 6, 1974. Thus, if the loss due to the dishonest or fraudulent acts of Clough was first discovered on December 9, 1972, the notice, sworn Proof of Loss, and filing of the action may have been timely; otherwise, the action must fail.

■ Obviously, Central National knew, in the summer of 1971, that losses had been, and would be, incurred by reason of Clough's actions. But the policy issued by Fidelity does not insure against "losses"; it provides coverage for "Any loss through any dishonest or fraudulent act of any of the Employees." The issue for our determination is whether we may conclude, as a matter of law, that Central National had knowledge that Clough's actions were "dishonest or fraudulent" which is not otherwise defined in Fidelity's policy.[10] We hold that reasonable persons may differ on what an employer may have known with respect to whether the acts were "dishonest or fraudulent", and reverse.

### ILLINOIS LAW

Since this is a diversity case, we are, of course, guided by Illinois law. While there is no Illinois authority squarely in point, there are certain conclusions that we may draw from the decided cases. Our ultimate conclusion is that whether an act is "dishonest or fraudulent", or whether reasonable persons should have perceived an act to be "dishonest or fraudulent", is generally for the jury.

In *Home Indemnity Company v. Reynolds & Co.*, 38 Ill.App.2d 358, 187 N.E.2d 274 (1962), the word "dishonest" is given a

---

The irregularities in question dealt primarily with unreasonable rate quotations, poor communication from the Group Vice President, and a breach of confidence and loyalty on the part of the Group Vice President.

In view of the findings of the Executive Committee, it was unanimously adopted that effective August 25, 1971, Mr. Lee Clough be terminated as Group Vice President of Central National Life Insurance Company with no termination benefits accruing to him, pending a complete investigation of his activities while acting as Group Vice President for the corporation.

10. Contrary to appellee's contention in a brief submitted to the trial court, it is not the claim of the appellant that "disobeying instructions

was dishonesty and that it is the alleged damage flowing from the failure to obey instructions which Central National seeks to recover against Fidelity." At trial it will be necessary to show the relationship between any specific loss with the alleged dishonest act which became known on December 9, 1972, when the series of checks from the three agents was disclosed for the first time. The exact nature of these checks is not before us, and it may possibly be shown that they were properly paid to Clough but the mere issuance of the checks and acceptance by Clough suggests a strong probability that they were "kickbacks" to Clough for his services in approving low rates and/or guaranteed rates in excess of 12 months.

broad meaning which could arguably include the set of facts stated in the instant case. After pointing out that the act committed need not involve criminal liability of the employee, that the latter need not personally profit by his acts, and that mere negligence, mistake, error or incompetence cannot be characterized as "dishonest", the court said:

If reasonable men can differ whether the acts were dishonest, within the wide scope of that word, the question is one of fact for the jury. *London and Lancashire Indemnity Co. of America v. Peoples Nat. Bank & Trust Co.*, 59 F.2d 149 (C.A.7); *Irvin Jacobs & Co. v. Fidelity Deposit Co. of Maryland*, 202 F.2d 794 (C.A.7); *Mortgage Corp. of N.J. v. Aetna Casualty & Surety Co.*, 19 N.J. 30, 115 A.2d 43.

In the *Home Indemnity Company* case, the court emphasizes the words of Chief Judge (later Supreme Court Justice) Cardozo in *World Exchange Bank v. Commercial Casualty Ins. Co.*, 255 N.Y. 1, 173 N.E. 902 (1930), where he said:

We think the quality of the act is not so obvious and determinate as to exclude opposing inferences . . . Criminal the act was not, unless done with criminal intent . . . The presence of that intent is not, in the setting of these circumstances, an inference of law. [continuing beyond the Illinois court quotation] The question is perhaps closer whether the act within the meaning of the policy must be said to be "dishonest", for dishonesty within such a contract may be something short of criminality. . . . The appeal is to the mores rather than to the statutes. Dishonest, unlike embezzlement or larceny, is not a term of art. Even so, the measure of the meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. "Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract" . . . ..

The act was a wrongful one, very likely a technical conversion, certainly a departure from instructions, but in the common speech of men there would be reluctance to describe it as flagitious or dishonest.

The definition of "dishonest" as stated in *Home Indemnity Company, supra*, was followed by a later Illinois case in *Daniel Grocer Co. v. New Amsterdam Casualty Co.*, 133 Ill.App.2d 488, 266 N.E.2d 365 (1971).

In *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland*, 202 F.2d 794 (7th Cir. 1953), cited with approval by the Illinois court in *Home Indemnity Company, supra*, the court had this comment:

[M]ere negligence, mistake, or error of judgment would not ordinarily be considered a dishonest act. Acts resulting from incompetence cannot be characterized as dishonest.

We must, of course, consider the knowledge possessed by Central National on or about August 25, 1971 as to Clough's acts. Could they be construed as negligence, a mistake or incompetence? If so, or if reasonable persons could differ, the matter is for the trier of facts.

The other case cited with approval by the Illinois court in *Home Indemnity Company, supra*, is *London & Lancashire Indemnity Co. v. Peoples Natl. Bank & Trust Co.*, 59 F.2d 149 (7th Cir. 1932). The dishonest acts of one Maple, the bank's trust officer and cashier were involved. Within one month after the issuance of the fidelity bond, a draft purportedly signed by Samuel K. Baird in the sum of $5000 was credited by the bank to the account of another bank of which one Bolinger was its president. The draft was dishonored and the appellee bank suffered the loss. The antecedent facts, prior to the issuance of the policy, overwhelmingly demonstrated that Maple and Bolinger were attempting to keep Bolinger's bank alive by a series of forgeries and other manipulations. The court, after stating that a "dishonest act" need not be such as would involve criminal liability of the

employee but could indicate a reckless, willful, and wanton disregard for the interest of the employer, held:

> With this positive knowledge on Maple's part that Bolinger and his bank were wholly unworthy of credit for any amount whatever, in our judgment the evidence fairly raised a jury question as to whether Maple had acted honestly toward his bank in consenting, directly or indirectly, to this further credit to Bolinger or his bank.

The foregoing case did not involve any issue of summary judgment, but was considered on a motion for a new trial following a jury verdict and judgment for the plaintiff.

We have reviewed the Illinois authorities cited by appellee in its brief filed with the trial court and find them to be inapposite. The vast majority of these cases relate to the delay in giving notice following an accident.[11] We have no problem with these cases as accidents are known and "discovered" when they occur.

Our attention has been directed to the recent case of *First Nat. Bank Co., etc. v. Insurance Co.*, 606 F.2d 760 (7th Cir. 1979).[12] In that case the action of the district court in granting partial summary judgment to the insured bank in an action on two bankers blanket fidelity bonds was affirmed. In no sense do we disagree with that decision. The action did not, as in this case, involve a question as to when the insured knew or should have known of the dishonest or fraudulent act or acts of the covered employee. In *First Nat. Bank Co.*, the bank's president was directly involved in three types of dishonesty and fraud, all clearly documented as to the participation by the bank's president and in one instance by the president's admission as to conversion of funds. We agree, of course, that Rule 56

does not provide a method by which the presence of an issue of fact can be determined, and that each case depends on the facts peculiar to it. Indeed, it is largely on this basis that we now reverse the summary judgment granted in the present case.

## GENERAL AUTHORITIES

■ The assertion by Fidelity that Central National knew or should have known that Clough's prior acts were dishonest or fraudulent is an affirmative defense and Fidelity has the burden of proof. Stated otherwise, Fidelity had the burden of showing that Clough's prior activities amounted to more than unwise decisions, negligence, poor business practice, lacking in the exercise of good judgment, or mere failure to obey instructions.

As stated in 13 *Couch on Insurance*, 2d § 49:231

> Whether the insured had such knowledge as required him to give notice as stipulated in the policy is for the jury where some evidence tends to show the required degree of knowledge. Whether or not the employer discovered a loss is generally a jury question, and the question whether the insured acquired knowledge from which he might reasonably conclude that his employee had been committing fraudulent and dishonest acts is a mixed question of law and fact to be submitted to the jury.

The same established principle of law is mentioned in 11 Appleman, *Insurance Law and Practice*, § 6978, where it is said:

> Whether or not the employer prior to the defalcation upon which an action is based had obtained knowledge of dishonest facts was a question of fact.

---

11.  *Keehn v. Excess Ins. Co. of America*, 129 F.2d 503 (7th Cir. 1942), applying Illinois law; *Country Mut. Cas. Co. v. Van Dusen*, 351 Ill. App. 112, 113 N.E.2d 852 (1953); *International Harvester Co. v. Continental Cas. Co.*, 33 Ill. App.2d 467, 179 N.E.2d 833 (1962), holding that whether notice of an accident has been seasonably given is generally one of fact.

12.  The opinion in the cited case attempts to interpret according to Illinois law, the words "dishonest" and "fraudulent" with reference to conduct covered by a fidelity bond and states that these words are to be given a broad meaning. We agree, and the broader the meaning is reflective of what a reasonable employer under similar circumstances knew or should have known—a question almost universally left to the jury.

In the present case Fidelity relies almost entirely on the depositions of Central National's officers. True, the officers knew than Clough had quoted and issued one or more policies at rates appreciably lower than the manual or without checking with the actuary. Likewise, they knew that rates in some instances had been guaranteed beyond the period of 12 months contrary to instructions, as well as the fact that excessive commissions had been awarded to agents. However, they had no intimation that Clough was engaged in any dishonest or fraudulent activity until the series of Risken checks, payable to Clough, came to light on December 9, 1972.

As far as Clough is concerned, his deposition has not been taken or, if taken, it has not been submitted.

While Clough, according to the depositions submitted, was clearly guilty of certain "wrongdoings" as urged by Fidelity, the policy does not provide coverage for "wrongdoing". Is every "wrongdoing" a dishonest or fraudulent act within the meaning of the policy? We think not, and doubt whether Fidelity would ever agree that "wrongdoings" are covered under the policy.

■ We agree that the acts of Clough did not have to reach the point of personal profit to himself before coming within the terms of the bond. In this case we have no evidence of false entries on the records of Central National. Unlike Judge Sprecher's opinion in *Citizens State Bank v. Transamerica Insurance Company*, 452 F.2d 199 (7th Cir. 1971), which involved Indiana law and a concealment of a reconcilement ledger and dishonored checks, and which case was submitted to the trier of fact after trial, there was no deliberate deception by pretense and stealth until it developed that a series of checks from the agents, payable to Clough, were discovered. Any reporting of a loss under the bond following Clough's discharge in August, 1971, would have prompted Fidelity to assert the well-accepted rule that an insurer is not liable under the terms of a fidelity bond covering dishonest or fraudulent acts of the insured's employee for losses occasioned by mere negligence, carelessness, inattention to business, mistake, errors in judgment, incompetency, or other acts or omissions not denoting conscious wrongdoing or involving moral turpitude. *First Nat. Bank of So. Maryland v. United States Fid. & G. Co.*, 275 Md. 400, 340 A.2d 275, citing the Seventh Circuit case of *Irvin Jacobs & Co. v. Fidelity & Deposit Co. of Maryland, supra*. Since the law presumes every man honest until the contrary is established, mere discrepancies do not necessarily warrant the conclusion that an employee is guilty of fraud or dishonesty in the handling of the employer's affairs as the language used, i. e., fraud or dishonesty, implies positive acts of wrongdoing. *Salley v. Globe Indem. Co.*, 133 S.C. 342, 131 S.E. 616, 43 A.L.R. 971.

In *Fidelity & Deposit Co. of Maryland v. Bates*, 76 F.2d 160 (8th Cir. 1935), an opinion by Circuit Judge Sanborn, the evidence disclosed that the insured bank knew of the losses long prior to notifying the bonding company, but the court said:

So far as the giving of notice and proofs of loss by the bank to the defendant is concerned, we think the trial court was not required to hold *as a matter of law* that the provisions of the bond had not been complied with or that the compliance had been waived. *True, the bank knew of the losses long prior to notifying the defendant,* but the claim is that it did not know that the losses were within the coverage of the bond, because it was not then realized that they were due to Sloan's dishonesty. . . . The bond required the bank to give notice only of losses which were covered by the bond. There was evidence which would justify the jury in concluding that notice was given and proofs of loss were made as soon as the directors were aware that the losses were due to Sloan's dishonesty. (Emphasis supplied)

In a case far more aggravated as to what the insured knew (as contrasted with Central's claim against Fidelity) and failed to report to the bonding company, but was justified in giving a delayed notice, the

Fifth Circuit majority in *Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.*, 426 F.2d 729 (5th Cir. 1970), rehearing and rehearing *en banc* denied July 30, 1970, had this to say:

> The fact that the nonconforming nature of the notes [a purchase by the Chairman of Board of notes which did not conform to the requirements of the National Banking Act] was discovered by the Bank in October of 1963, however, does raise the question whether the transaction might involve something more than merely the purchase of nonconforming notes and was obligated to inquire further into the transaction and give notice of its suspicions to the insurance companies. The well-established rule is that the Insured under a blanket employee's fidelity bond is not bound to give notice "until he [has] acquired knowledge of some specific fraudulent or dishonest act which might involve the [Insurer] in liability for the misconduct." Notice is not required when the obligee merely suspects or has reason to suspect the wrongdoing. *American Surety Co. v. Pauly,* 170 U.S. 133, 144, 18 S.Ct. 552, 556, 42 L.Ed. 977 (1898). Accord, *United States Fidelity & Guaranty Co. v. Walker,* 5 Cir. 1918, 248 F. 42. See 129 A.L.R. 1411 and 23 A.L.R.2d 1065. In other words, the Bank was not required to give notice to the insurance companies at the time the nonconforming nature of the notes was discovered even if it did have reasons to suspect wrongdoing. The District Court was, therefore, correct in holding that notice [given March 18, 1964] had been given within the time limits established by the bonds.

Since there was a strong dissent by Circuit Judge Godbold on this sole issue,[13] it is important to note that a petition for rehearing and the petition for rehearing *en banc* were denied.[14]

Citing the foregoing authority with approval as to the meaning of "discovery" in timely notice provisions, *Perkins v. Clinton State Bank,* 593 F.2d 327 (8th Cir. 1979), held, in a case in which the bank was insured against the negligent release of escrow documents based on false misrepresentations, that the test of discovery must relate to a reasonable person's subsequent awareness of facts which would convert his negligent appreciation of the facts into actual knowledge of the alleged dishonesty. Id. at 335.

In *Federal Deposit Insurance Corporation v. Lott,* 460 F.2d 82 (5th Cir. 1972), rehearing and rehearing *en banc* denied May 23, 1972, the notice requirements of a banker's blanket bond were in issue. In May, 1966, the state banking department issued its report which criticized two lines of credit, one being a company in which Lott, the defaulting employee and president of the bank, held an interest along with another bank director. The extension of credit was in excess of the bank's legal loan limit. The report also criticized overdrafts to these two lines of credit which had been held as cash items for several weeks. All directors signed a form stating that they had read the report or had it read to them. A later report in March, 1967, revealed similar discrepancies, all of which were known by the directors. The bank closed in February, 1968, but, in the interim, a third examination of the bank was made in June, 1967, which again reflected excess loans to the same two lines of credit. This report was read by Lott to the directors, but he omit-

13. Fidelity cites Judge Godbold's dissent as authority for its position, overlooking the fact that the majority held otherwise and that rehearing and rehearing *en banc* were denied.

14. The Fourth and Fifth circuits evaluate what constitutes "discovery of the loss" in somewhat differing views. In *C. Douglas Wilson & Co. v. Ins. Co. of North America,* 590 F.2d 1275 (4th Cir. 1979), *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39, the majority held, *as a mat-* *ter of law,* that the employer had notice of a loss under the bond where the employee made false certifications of pre-advances in violation of 18 U.S.C. § 1010. We distinguish this case by noting that the employer at least had knowledge of the violation of a *criminal* statute and did not notify the bonding company. In our case, the knowledge of the employer on August 25, 1971 and thereafter until December 9, 1972, did not involve a criminal violation on its face.

ted the critical portions of the excessive loans and the cash items held for these companies. The directors had questioned Lott as to the excessive loans in the first two reports, but were assured that he was taking care of the problem. Aetna Casualty & Surety Company appealed on the ground that the directors knew, more than 100 days before notice and proof of loss, that the excessive loans had been extended. In affirming a judgment for the bank, the Fifth Circuit said (p. 86):

> The fact that the directors may have had knowledge of irregularities and violations, i. e., the holding of excessive cash items and exceeding the legal loan limit, is not by itself sufficient to trigger the bank's obligation to notify Aetna. [Citing American Surety Co. v. Pauly and Federal Deposit Insurance Corporation v. Aetna Casualty & Surety Co., both supra.]

. . . . .

This issue was particularly well suited for jury determination and upon review of the evidence we think reasonable men might have reached different conclusions as to its outcome.

A case comparatively similar to the Central National–Fidelity situation is United States Fidelity & Guar. Co. v. Empire State Bank, 448 F.2d 360 (8th Cir. 1971), where a fidelity bond, issued on July 1, 1965, covered the dishonesty of any employee, sustained at any time, and discovered during the policy period. The bank's executive vice president was the dishonest employee involved. The bank knew, prior to July 1, 1965, that certain loans made to Briar Associates, and cosigned by Robbins who controlled Briar Associates, had been made with inadequate collateral; that Robbins had an unsavory personal, and unsatisfactory credit, reputation; and that Robbins claimed that he had made a "pay-off" to the executive vice president in order to obtain loans from the bank. However, it was not until after July 1, 1965, that the bank substantiated Robbins' charges that he sent $2500 to the executive vice president by Western Union money order. In September, 1965, the bank

sent an investigator to interview the former executive vice president, who then denied that Robbins had loaned him any money, and further denied receiving any money from Robbins in connection with any loan transaction, although Robbins had advised the bank, in June, 1965, that this was a commission paid to the executive vice president for obtaining credit with the bank. In affirming a district court judgment for the bank on the issue of "discovery" subsequent to July 1, 1965, the Eighth Circuit adopted the language from Wachovia Bank & Trust Co. v. Manufacturers Casualty Insurance Co., 171 F.Supp. 369 (M.D.N.C.1959), holding that discovery imports an awareness of the significance of known facts and that "not only must the facts be known, but they must also be recognized for what they are." As Wachovia Bank & Trust Co. pointed out, "Inefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as [with] their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist." And in dealing with the law or fact issue, the court said:

> Given the information known to Empire [the bank] prior to July 1, 1965, we cannot say that a reasonable man would have necessarily appreciated that he had sustained a loss caused by the dishonesty of a trusted former employee.

The foregoing authority also stands for the proposition that the trier of fact is concerned with the "subjective conclusions" reasonably drawn from the underlying facts known to the insured. Id. 448 F.2d at 365.

Fidelity relies, in part, upon Hidden Splendor Mining Co. v. General Ins. Co. of America, 370 F.2d 515 (10th Cir. 1966), a case tried to the court without a jury, wherein a 15 day time limitation after the discovery of a fraudulent or dishonest act was required by the terms of the policy. The trial court held that Hidden Splendor had notice of facts sufficient to put any reasonable and prudent person on notice that a fraud had been committed more than 15 days prior to the giving of notice, and

that Hidden Splendor, after receiving knowledge of all facts, had sought restitution from the defaulting employee rather than notify the bonding company. The only issue was whether the findings and conclusion of the trial court were clearly erroneous. Hidden Splendor contended that the fraud was not discovered until the employee repudiated a prior agreement to make restitution which was within the 15 day period. Two prior reports from highly reputable accounting firms had clearly revealed that $375,000 had been paid to the dishonest employee without authorization, and these reports had been received long prior to any purported notice to the bonding company. Our present situation did not involve any attempt at restitution from Clough or, in fact, any statement that Clough had acted dishonestly or fraudulently until after discovery of the agents' checks, payable to Clough, nearly 16 months after Clough's discharge.

Fidelity also cites *J. S. Fraering, Inc. v. Employers Mut. Liab. Ins. Co. of Wis.*, 242 F.2d 609 (5th Cir. 1957), in which case a 15 day notice was required by the terms of the bond and an investigation revealed an inventory shortage with the names of the employees who had been detected in stealing. No employee was discharged, and no notice was given to the bonding company. Six months later, with the pilfering continuing on a substantial scale, another investigation and report disclosed the same dishonest employees, with two exceptions and two additions. Notice was then given to the bonding company. Plaintiff attempted to establish its inventory shortage for a 12 month period, with losses for the last 5 months aggregating slightly more than one-quarter of the total 12 month loss, but failed to produce any evidence as to the amounts taken by defaulting employees prior to the first investigation and report. The trial court directed a verdict for the bonding company on the basis that coverage of the employees found to be stealing by the first report had ceased, and that there was no proof of the amounts of pilferage of those not involved in the earlier thefts. On these facts, the Fifth Circuit affirmed without consideration of the losses occurring between the first and second reports as to employees not mentioned in the first report. We fail to see how this case is applicable to the facts herein presented.

Appellee likewise relies upon *First Nat. Bank of Sikeston v. Transamerica Ins. Co.*, 514 F.2d 981 (8th Cir. 1975). This involved the fraudulent acts of a former president of the bank who became engaged in a complex "float" scheme which permitted a company, in which the former president was a part-owner, to use hundreds of thousands of dollars for short periods (while checks were going through various banks) without any payment of interest. Finally, the scheme caught up with the perpetrators of the fraud and certain checks were dishonored with the ultimate responsibility falling upon the appellant-bank as the result of prior litigation. In reversing the trial court, the Eighth Circuit held that the bank officials were well aware that the president was using his influence at First National to assist the company in which he was a part-owner, all to the possible detriment of the bank, and that the fraudulent acts of the president were known to bank officials many weeks prior to the loss occasioned by the return of checks as dishonored. The bank at all times had knowledge of and participated in the check "float" arrangement. While this case, in some respects, is similar to what is here presented, we adopt the view that each case must be decided on its own facts and, as our case was determined essentially on the failure to give notice after alleged discovery of a loss covered by the bond, we do not feel that the cited case, which involved termination of coverage as to the employee, is sufficient to sustain the appellee's position that the granting of summary judgment was correct. The conscious awareness of the dishonest or fraudulent acts of Clough was not known until December, 1972, whereas in the cited case, there was a conscious awareness of the president's acts over a long period of time.

Turning to the Seventh Circuit, Fidelity seeks some satisfaction from *Ipava Farmers*

*Elevator Co. v. Hawkeye-Security Ins. Co.*, 222 F.2d 833 (7th Cir. 1955), a case tried to a jury as to whether the insured knew, or should reasonably have known, that the dishonest employee was misappropriating funds. A verdict and judgment favorable to the insured was affirmed on appeal. We do not contend that, under the facts of the present case, there was no obligation to report to the bonding company at such time as Central National knew, or should reasonably have known, that Clough had committed dishonest or fraudulent acts covered under the terms of the bond. We merely state that reasonable persons may have a differing interpretation as to whether Clough's acts were dishonest or fraudulent or, on the other hand, were the result of negligence, failure to follow instructions, incompetence, error or mistake, lack of attention to business, or other factors heretofore enumerated. A responsible employer must, of necessity, act with caution before charging an employee with dishonesty or fraudulent conduct.

And in *American Surety Co. v. Bankers' Savings & Loan Ass'n.*, 59 F.2d 577 (8th Cir. 1932), also relied upon by appellee, the evidence revealed that, as early as October, 1924, the plaintiff discovered, and the employee admitted, certain abstractions and misapplication of funds. The employee gave a note to cover these peculations, and was discharged. The following day the Association discovered in its file another note given by the same employee in an amount more than double the amount of the note given on the prior day. The Association knew that this latter note, payable to plaintiff, did not represent any legitimate indebtedness of the employee to the Association. Although the fidelity bond required notice within 10 days after discovery of the loss, no notice was given to the bonding company. The Association then requested the state banking department to make an examination and this was not completed until March 10, 1925. An oral notice of the result of the examination was given to certain representatives of the defendant in

Nebraska, but no written notice was provided until May 18, 1925. While we find no fault with that portion of the opinion upon which Fidelity relies, it is abundantly clear that the Association had notice, in fact an admission, that the employee was corrupt and had misappropriated the Association's funds. In the present case, had Central National known of the alleged "kickback" arrangement between the agents and Clough as of the date of Clough's discharge, or at any other time prior to December 9, 1972, there would have been a clear obligation to report if it anticipated holding Fidelity liable. But there was no knowledge of anything corrupt on Clough's part, although the finger of suspicion may have properly pointed to him.

Both sides rely upon a quotation from *City Loan & Sav. Co. v. Employers' Liability Assur. Corp. Ltd.*, 249 F.Supp. 633 (N.D. Ohio 1964), aff'd. without opinion at 356 F.2d 941 (6th Cir. 1966). Again, we have no fault to find with the language used, but we note with interest that the case was fully tried, followed by a 26 page opinion including 56 findings of fact and 15 conclusions of law. This is hardly any support for the granting of summary judgment.[15] Indeed, it is an indication that courts should act cautiously in granting summary judgment. As summarized in *S. J. Groves & Sons Company v. Ohio Turnpike Commission*, 315 F.2d 235 (6th Cir. 1963), it is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts and, in such a situation, the case is not one to be decided on summary judgment.

Concluding as we must that reasonable persons could disagree as to the inferences to be drawn from the facts possessed by Central National at all times prior to December 9, 1972, and that the alleged lack of notice is a question for the trier of fact, we reverse and remand for further proceedings. We do not hold, as a matter of law,

15. *City Loan & Sav. Co., supra,* is the only authority cited by the majority in the case

referred to in footnote 14 decided by the Fourth Circuit.

that a notice given on February 5, 1973 with respect to a loss discovered on December 9, 1972, necessarily complies with the requirements of Section 4 of the bond which calls for a written notice "at the earliest practicable moment after discovery of any loss hereunder." This is likewise a factual issue.

No. 78–1768 and No. 78–1769 REVERSED AND REMANDED.